UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GARY CAVINESS, Derivatively On Behalf of ASPEN TECHNOLOGY INC., | ) ) ) | Case No. 04 12524 RCL |
| | ) ) ) | VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, |
| ABUSE | ) ) ) ) ) | OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| LAWRENCE B. EVANS, LISA W. ZAPPALA, DAVID L. MCQUILLIN, CHARLES F. KANE, STEPHEN M. JENNINGS, JOAN C. MCARDLE, MICHAEL PEHL, DOUGLAS A. KINGSLEY, GARY E. HAROIAN, MARK FUSCO, DONALD P. CASEY, STEPHEN L. BROWN, JOSEPH F. BOSTON, DOUGLAS R. BROWN and GRESHAM T. BREBACH, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| - and - | ) ) ) | |
| ASPEN TECHNOLOGY INC., a Delaware corporation, | ) ) ) ) ) | |
| Nominal Defendant. | ) ) ) | |
| _____ | ) | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Amended Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Aspen Technology Inc., ("AspenTech" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between July 1, 1999 and the present (the "Relevant Period") and that have caused substantial losses to AspenTech and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Massachusetts so as to render the exercise of jurisdiction by the Massachusetts courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to AspenTech occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.      Defendant AspenTech describes itself as the "leading supplier of integrated software and services to the process industries, which consist of oil and gas, petroleum, chemicals,

- 1 -

pharmaceuticals and other industries that manufacture and produce products from a chemical process." The Company develops and markets software and services to companies in the process industries.

6.     Throughout the Relevant Period, defendants issued numerous positive statements and filed quarterly reports with the Securities and Exchange Commission ("SEC") which described the Company's increasing financial performance.  These statements were materially false and misleading because they failed to disclose and misrepresented the following adverse facts, among others: (i) that the Company had improperly and prematurely recognized revenue for certain software license and service agreement transactions entered into with certain alliance partners and other customers during FY:00, FY:01, FY:02, FY:03 and FY:04; (ii) that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and (iii) that as a result of the foregoing, the values of the Company's revenues, earnings, assets and/or liabilities for FY:00 through FY:04 were improperly accounted for and would have to be restated.

7.     On October 27, 2004, defendants caused the Company to issue a press release announcing the commencement of an investigation by AspenTech's Board of Directors' (the "Board") Audit Committee into the Company's accounting for software license and service agreement transactions entered into during FY:00, FY:01 and FY:02.  The Audit Committee's investigation was subsequently expanded to include certain transactions occurring in FY:99 and FY:03-FY:04 (collectively, with FY:00-FY:02, referred to as the "restatement period").  The investigation revealed, in part, improper accounting of software license revenue to resellers which should have been recorded on a consignment basis, resulting in a deferral of license revenues, instead of up front prior to resale to end users, as well as improper timing of reductions in software license revenues.

8.     On March 15, 2005, the defendants caused the Company to issue a press release announcing the completion of the investigation and filing of a restated Annual Report in Form 10-K/A for FY:04 and restated financial statements for FY:00-FY:04.

**THE PARTIES**

9.      Plaintiff Gary Caviness ("Caviness") is, and was at times relevant hereto, an owner and holder of AspenTech common stock.  Caviness is a citizen of Florida.

10.      Nominal defendant AspenTech is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at Ten Canal Park Cambridge, Massachusetts.  AspenTech supplies software products and services for the analysis, design and automation of process manufacturing facilities.  The Company's software and services are used by companies in the chemical, petroleum, pharmaceuticals, pulp and paper, and metal industries.

11.      Defendant Lawrence B. Evans ("Evans") is a principal founder of AspenTech and was, at times relevant hereto, Chairman and Chief Executive Officer ("CEO").  Evans served as Chairman until his retirement on January 13, 2005.  Evans continues to serve as a Senior Advisor to AspenTech.  Because of Evans' positions, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Evans participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:04, FY:03, FY:02, FY:01 and FY:00 AspenTech paid defendant Evans $325,000, $276,250, $314,844, $325,000 and $560,000  respectively, in salary, bonus and other compensation, and granted him 33,000, 41,016, 22,500, 22,000 and 45,000 options to purchase AspenTech stock, respectively.  During the Relevant Period, Evans sold 5,000 shares of AspenTech stock for proceeds of $150,000.00.  Evans is a citizen of Massachusetts.

12.      Defendant Lisa W. Zappala ("Zappala") was, at times relevant hereto, Chief Financial Officer ("CFO") of AspenTech from the beginning of the Relevant Period to July 2003.  Because of Zappala's position, she knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement

transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. During the Relevant Period, Zappala participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, FY:02, FY:01 and FY:00, AspenTech paid defendant Zappala $191,250, $217,969, $225,000 and $285,250 respectively, in salary, bonus and other compensation, and granted her 25,704, 20,000, 20,000 and 30,000 options to purchase AspenTech stock, respectively. During the Relevant Period, Zappala sold 14,000 shares of AspenTech stock for proceeds of $608,000.00. Zappala is a citizen of Massachusetts.

13. Defendant David L. McQuillin ("McQuillin") was, at times relevant hereto, President, CEO and director of AspenTech from October 2002 until November 2004. Because of McQuillin's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, McQuillin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, FY:03, and FY:02, AspenTech paid defendant McQuillin $350,000, $289,744 and $350,962, respectively, in salary, bonus and other compensation, and granted him 1,516,609, 450,891 and 22,500 options to purchase AspenTech stock, respectively. During the Relevant Period, McQuillin sold 220,000 shares of AspenTech stock for proceeds of $2,830,700.00. McQuillin is a citizen of Massachusetts.

14. Defendant Charles F. Kane ("Kane") is, and at times relevant hereto, has served as Senior Vice President and CFO of AspenTech since July 2003. Kane also served as Interim CEO of

AspenTech. Because of Kane's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Kane participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, AspenTech paid defendant Kane $250,000 in salary, bonus and other compensation, and granted him 339,216 options to purchase AspenTech stock. Kane is a citizen of Massachusetts.

15.     Defendant Stephen M. Jennings ("Jennings") is, and at all times relevant hereto was, a director of AspenTech. At times during the Relevant Period, Jennings served as lead director and Interim Chairman. Because of Jennings' position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Jennings participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Jennings is a citizen of Massachusetts.

16.     Defendant Joan C. McArdle ("McArdle") is, and at all times relevant hereto was, a director of AspenTech. Because of McArdle's position, she knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections

with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, McArdle participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. McArdle is a citizen of Massachusetts.

17.     Defendant Michael Pehl ("Pehl") is a director of AspenTech and has been since August 2003. Because of Pehl's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Pehl participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Pehl is a citizen of Massachusetts.

18.     Defendant Douglas A. Kingsley ("Kingsley") is a director of AspenTech and has been since August 2003. Because of Kingsley's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kingsley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Kingsley is a citizen of Massachusetts.

19.     Defendant Gary E. Haroian ("Haroian") is a director of AspenTech and has been since December 2003. Because of Haroian's position, he knew the adverse non-public information

about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Haroian participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Haroian is a citizen of Massachusetts.

20.    Defendant Mark Fusco ("Fusco") was a director of AspenTech at all times from December 2003 until December 2004. On January 3, 2005, Fusco assumed his responsibilities as President and CEO of AspenTech. Because of Fusco's position as a director, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Fusco participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Fusco is a citizen of Massachusetts.

21.    Defendant Donald P. Casey ("Casey") is a director of AspenTech and has been since April 2004. Because of Casey's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and

other information provided to him in connection therewith.  During the Relevant Period, Casey participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Casey is a citizen of Massachusetts.

22.    Defendant Stephen L. Brown ("S. Brown") was a director of AspenTech at all times relevant hereto, until April 2004.  Because of S. Brown's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, S. Brown participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, S. Brown sold 18,775 shares of AspenTech stock for proceeds of $165,422.75.  S. Brown is a citizen of Massachusetts.

23.    Defendant Joseph F. Boston ("Boston") was a director of AspenTech at all times relevant hereto, until October 2002.  Because of Boston's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Boston participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Boston sold 251,000 shares of AspenTech stock for proceeds of $9,210,400.00.  Boston is a citizen of Massachusetts.

24.    Defendant Douglas R. Brown (" D. Brown") was a director of AspenTech at all times relevant hereto, until April 2004.  Because of D. Brown's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, D. Brown participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. D. Brown is a citizen of Massachusetts.

25.    Defendant Gresham T. Brebach Jr. ("Brebach") was a director of AspenTech at all times relevant hereto, until April 2003.  Because of Brebach's position, he knew the adverse non-public information about the business of AspenTech, specifically, the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during the restatement period, as well as the finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Brebach participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Brebach is a citizen of Massachusetts.

26.    The defendants identified in &&11, 13, 15-25 are referred to herein as the "Director Defendants."  The defendants identified in &&11-14, 20 are referred to herein as the "Officer Defendants."  The defendants identified in &&11-13, 22-23 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## ASPENTECH BOARD OF DIRECTORS

**A.    Meetings of the Board of Directors**

27.    The Board met seventeen times in FY:04, twenty-six times in FY:03, twelve times in FY:02, nine times in FY:01 and eight times in FY:00.  Each director attended 75% of the total number of meetings held by the Board and its committees of which he or she was a member in each year.

**B.    Committees of the Board of Directors**

28.    The current standing committees of the AspenTech Board are: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Nominating and Corporate Governance Committee.

### 1.    Audit Committee

29.    Defendant McArdle served as a member of the Audit Committee in FY:00, FY:01, FY:02, FY:03 and FY:04.  Defendants Fusco and Haroian also served as members of the Audit Committee in FY:04.  Defendants Jennings and S.Brown served as members of the Audit Committee in FY:03.  Defendants S. Brown and Brebach served as members of the Audit Committee in FY:00, FY:01 and FY:02.  Defendant D. Brown served as a member of the Audit Committee in FY:02.

30.    The Audit Committee met nine times in FY:04, eight times in FY:03, ten times in FY:02, and six times in FY:01 and FY:00.

31.    Pursuant to the Audit Committee Charter, the Audit Committee ensures, "the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications and independence; and the performance of the Company's internal audit function and independent auditors."  The Audit Committee's duties and responsibilities include:

> The Audit Committee shall discharge its responsibilities, and shall assess the
> information provided by the Company's management and the independent auditor, in

accordance with its business judgment.

\* \* \*

### Oversight of Independent Auditors

*Selection*. The Audit Committee shall be solely and directly responsible for appointing, evaluating and, when necessary, terminating the engagement of the independent auditor. The Audit Committee may, in its discretion, seek stockholder ratification of the independent auditor it appoints.

\* \* \*

*Oversight*. . . . In connection with its oversight role, the Audit Committee shall, from time to time as appropriate, receive and consider the reports required to be made by the independent auditor regarding:
– critical accounting policies and practices;
– alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with Company management, including ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and
– other material written communications between the independent auditor and Company management.

### Review of Audited Financial Statements

*Discussion of Audited Financial Statements*. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.

*Recommendation to Board Regarding Financial Statements*. The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

*Audit Committee Report*. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

### Review of Other Financial Disclosures

*Independent Auditor Review of Interim Financial Statements*. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief

- 11 -

Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by Statement on Auditing Standards Nos. 61, 71 and 90. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

**Controls and Procedures**

*Oversight.* The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal accounting controls for financial reporting, the Company's disclosure controls and procedures and the Company's code of conduct. The Audit Committee shall receive and review the reports of the CEO and CFO required by Section 302 of the Sarbanes-Oxley Act of 2002 (and the applicable rules thereunder) and Rule 13a-14 of the Exchange Act.

\* \* \*

The Audit Committee Shall report regularly to the Board of Directors.

\* \* \*

The Audit Committee shall have the authority to conduct or authorize investigations into any matters within the scope of its responsibilities as it shall deem appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Audit Committee or any advisors engaged by the Audit Committee.

32.    Defendants Fusco, Haroian and McArdle submitted the following report, which thereby incorporated fabricated financial results, for inclusion in the FY:04 proxy statement, which states in relevant part:

Based on its discussions with management and the independent auditors, and its review of the representations and information provided by management and the independent auditors, the audit committee recommends to our board of directors that the audited the audited financial statements be included in our annual report on Form 10-K for the year ended June 30, 2004.

33.    Defendants S. Brown, Jennings and McArdle submitted a similar report, which incorporated fabricated financial results for inclusion in the FY:03 proxy statement; defendants D. Brown, S. Brown, McArdle and Brebach submitted a similar report, which thereby incorporated fabricated financial results for inclusion in the FY:02 proxy statement; defendants S. Brown, McArdle and Brebach submitted a similar report, which thereby incorporated fabricated financial

results for inclusion in the FY:01 proxy statement; and defendants S. Brown, McArdle and Brebach submitted a similar report, which thereby incorporated fabricated financial results for inclusion in the FY:00 proxy statement.

34.    The members of the Audit Committee knew or should have known that the Company's financial statements were false and thereby permitted or condoned the unlawful practices described herein.  Accordingly, defendants through their improper execution of their duties and responsibilities as members of the Audit Committee knew of and/or recklessly disregarded the rampant unlawful practices including, but not limited to, breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as more fully described herein.

35.    Further, as members of the Audit Committee and AspenTech Board, the above-named directors received briefings, reports, and internal communications concerning the unlawful practices described herein.  The defendants, however, either allowed AspenTech to knowingly continue those practices, or failed to order AspenTech to adopt and fully implement lawful practices sufficient to discourage and/or halt the unlawful practices alleged herein.  Furthermore, defendants caused AspenTech to deceive its shareholders and/or the SEC by providing misleading financial information in its publicly filed documents resulting from improper revenue recognition, lack of internal controls, and material overstatements of the Company's revenues, earnings, assets and/or liabilities.  By engaging in these unlawful practices, defendants have not only exposed themselves to claims of securities fraud, but have also exposed the Company that they were entrusted to protect to multiple lawsuits.

### 2.    Compensation Committee

36.    Defendants Fusco and Casey served as members of the Compensation Committee in FY:04.  Defendant Jennings has served as a member of the Compensation Committee in FY:04,

FY:03, FY:02, FY:01 and FY:00.     Defendant D. Brown has served as a member of the Compensation Committee in FY:03, FY:02, FY:01 and FY:00.  Defendant Brebach has served as a member of the Compensation Committee in FY:02, FY:01 and FY:00.  Defendant S. Brown served as a member of the Compensation Committee in FY:03 and FY:02.  Defendants McArdle served as a member of the Compensation Committee in FY:02.

37.     The Compensation Committee met three times in FY:04, eight times in FY:03, ten times in FY:02, and only once in FY:01 and FY:00.  This Committee determines the compensation for AspenTech executive officers and establishes AspenTech's compensation policies and practices.

38.     Furthermore, the duties of the Compensation Committee are provided in the Committee's Charter.  The Charter evaluates compensation for executive officers as follows:

> The Compensation Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management, in accordance with its business judgment.

* * *

> The Compensation Committee shall review and approve, or recommend for approval by a majority of the independent directors of the Board of Directors, executive officer (including the Company's Chief Executive Officer (the "CEO")) compensation, including salary, bonus and incentive compensation levels; deferred compensation; executive perquisites; equity compensation (including awards to induce employment); severance arrangements; change-in-control benefits and other forms of executive officer compensation.

* * *

> The Compensation Committee shall periodically review and make recommendations to the Board of Directors with respect to incentive-compensation plans and equity-based plans. In addition to any recommendation provided by the Compensation Committee to the full Board of Directors, the Compensation Committee shall approve, or recommend for approval by a majority of the independent directors of the Board of Directors, any tax-qualified, non-discriminatory employee benefit plans (and any parallel nonqualified plans) for which stockholder approval is not sought and pursuant to which options or stock may be acquired by officers, directors, employees or consultants of the Company.

* * *

The Compensation Committee shall periodically review and make recommendations to the Board of Directors with respect to director compensation.

\* \* \*

If during the last fiscal year of the Company (while the Company was a reporting company pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (the "Exchange Act")) any adjustment or amendment was made to the exercise price of any stock option or stock appreciation right previously awarded to a "named executive officer" (as such term is defined from time to time in Item 402(a)(3) of Regulation S-K), the Compensation Committee shall furnish the report required by Item 402(i) of Regulation S-K.

39.     The Compensation Committee was further charged with ensuring that AspenTech officers and directors would not be unduly compensated for engaging in activities harmful to the Company.  As AspenTech reported artificially inflated earnings resulting from the defendants' misrepresentation, the defendants received substantial salaries, bonuses and other perquisites.  The members of the Compensation Committee knew, or should have known, that the Company was unduly compensating its officers and directors and thereby permitted or condoned the unlawful practices described herein.  Accordingly, through their improper execution of their duties and responsibilities as members of this Committee, certain defendants were permitted to reap substantial compensation and benefits.

### 3.      Nominating and Corporate Governance Committee

40.     In September 2002, the Board formed the Nominating and Corporate Governance Committee.  Defendants Jennings and McArdle served as members of this committee in FY:04, FY:03 and FY:02.  Defendants Fusco and Casey served as members of this committee in FY:04.  Defendant S. Brown served as a member of this committee in FY:03 and FY:02.  Defendant D. Brown also served as a member of this committee in FY:02.

41.     The Nominating and Corporate Governance Committee met twice in FY:04, but held no meetings during FY:03 or FY:02.  The Nominating and Corporate Governance Committee Charter provides as follows: "The purpose of the Nominating and Corporate Governance Committee

- 15 -

is to: identify individuals qualified to become Board members; recommend to the Board the persons to be nominated by the Board for election as directors at the annual meeting of stockholders; develop and recommend to the Board a set of corporate governance principles applicable to the Company; and oversee the evaluation of the Board and management."

42.     Furthermore, the duties and responsibilities of the Nominating and Corporate Governance Committee create explicit control over Board and Committee candidates.

> The Nominating and Corporate Governance Committee shall be responsible for overseeing an annual self-evaluation of the Board to determine whether it and its committees are functioning effectively. The Committee shall determine the nature of the evaluation, supervise the conduct of the evaluation and prepare an assessment of the Board's performance, to be discussed with the Board.

> The Nominating and Corporate Governance Committee shall be responsible for overseeing the evaluation of the Company's senior executives. In conjunction with the Board's Compensation Committee and, in the case of the evaluation of the senior financial management, the Board's Audit Committee, the Nominating and Corporate Governance Committee shall determine the nature and frequency of the evaluation and the persons subject to the evaluation, supervise the conduct of the evaluation and prepare assessments of the performance of the Company's senior executives, to be discussed with the Board periodically.

43.     As provided in part above, the Nominating and Corporate Governance Committee is charged with overseeing an annual self-evaluation of AspenTech's Board to determine the effectiveness of the Board and also an annual evaluation of the Company's senior executives. Even as the Individual Defendants caused to have reported artificially inflated earnings resulting from the defendants' misrepresentations, the Nominating and Corporate Governance Committee continued to praise the performance and functionality of the Board and its committees. Clearly the members of this committee during the Relevant Period failed to carry out their fiduciary duties.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

44.     By reason of their positions as officers, directors and/or fiduciaries of AspenTech and because of their ability to control the business and corporate affairs of AspenTech, the Individual Defendants owed AspenTech and its shareholders fiduciary obligations of trust, loyalty, good faith

and due care, and were and are required to use their utmost ability to control and manage AspenTech in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AspenTech and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45.     Each director and officer of the Company owes to AspenTech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AspenTech, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with AspenTech, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of AspenTech.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AspenTech, and was at all times acting within the course and scope of such agency.

48.     To discharge their duties, the officers and directors of AspenTech were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of AspenTech were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times.

(e)    remain informed as to how AspenTech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

49.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AspenTech, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of AspenTech's Board during the Relevant Period.

50.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws.  As a result, AspenTech has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)    Costs incurred in investigating and defending AspenTech and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment; and

(c)    Costs incurred in restructuring charges and FTC legal costs, including $23.5 million in FY:04 and $41.1 million in FY:03.

51.    Moreover, these actions have irreparably damaged AspenTech's corporate image and goodwill.  For at least the foreseeable future, AspenTech will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that AspenTech's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERNED ACTION**

52.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties

53.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company prematurely recognized revenue for software licenses and service agreement transactions, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at AspenTech and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of AspenTech, regarding the Individual Defendants' management of AspenTech's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

54.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least July 1999 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that AspenTech had prematurely recognized revenue for software licenses and service agreement transactions.  In addition, defendants also made other specific, false statements about AspenTech's financial performance and future business prospects, as alleged herein.

55.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants'

violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of

corporate assets and unjust enrichment; to conceal adverse information concerning the Company's

operations, financial condition and future business prospects; and to artificially inflate the price of

AspenTech common stock so they could: (i) dispose of over $12.9 million of their personally held

stock; (ii) protect and enhance their executive and directorial positions and the substantial

compensation and prestige they obtained as a result thereof; and (iii) use the artificially inflated

Company stock as partial consideration to acquire Icarus Corporation ("Icarus") and Hyprotech Ltd

("Hyprotech") and enabled the Company to sign a definitive agreement for $100 million in private

equity financing on favorable terms.

56.    The Individual Defendants accomplished their conspiracy, common enterprise and/or

common course of conduct by causing the Company to purposefully, recklessly or negligently

recognize revenue for software licenses and service agreement transactions.  Because the actions

described herein occurred under the authority of the Board of Directors, each of the Individual

Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise

and/or common course of conduct complained of herein.

57.    Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing

**BACKGROUND**

58.    On October 27, 2004, the Individual Defendants caused the Company to shock the

market when it issued a press release announcing that its Audit Committee had undertaken a detailed

review of the accounting for certain software license and service agreement transactions entered into

with certain alliance partners and other customers during certain quarters of FY:00, FY:01 and FY:02. The press release provides, in pertinent part, as follows:

> Based on its preliminary review to date, the Audit Committee believes that one software license transaction in fiscal third quarter 2000 and two transactions in fiscal second quarter 2001 were included in AspenTech's results for such periods without reflecting the impacts of associated arrangements between AspenTech and those customers, which may require revised accounting treatment.

> The Committee has also identified a potential contingency associated with a fourth transaction recorded in the fourth fiscal quarter of 2001 which was not reflected in prior accounting, which may require revised accounting treatment.

59.     Upon this shocking news, on October 28, 2004, shares of the Company's stock fell to an intraday low of $5.50 per share, or approximately 20%, before closing at $6.68 per share, on unusually heavy trading volume.

60.     Then, on October 29, 2004, the Individual Defendants caused the Company to announce that federal prosecutors also launched a probe into the Company's accounting practices during FY:00, FY:01 and FY:02. The Company disclosed that it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents relating to transactions that it entered into during those years, and other documents dating from January 1, 1999.

61.     Once again, upon this shocking news, shares of the Company's stock fell an additional $0.67, or approximately 10%, to close at $6.01, on unusually heavy trading volume.

62.     Subsequent to its October 27, 2004 announcement, the Audit Committee expanded its investigation to include improper accounting for transactions in FY:99 through FY:04.

63.     On January 31, 2005, the Individual Defendants caused AspenTech to issue a press release announcing the substantial completion of the Audit Committee's investigation. The Company explained that the investigation found, in part, improper accounting of software license revenue to resellers which should have been recorded on a consignment basis, resulting in a deferral of license revenues, instead of up front prior to resale to end users, as well as improper timing of

reductions in software license revenues. The Company further revealed that there were sixteen separate transactions that were accounted for improperly, totaling approximately $18.5 million in improper revenue recognition. Consequently, the Company announced that revenue for FY:00 through FY:02 was overstated and FY:03 and FY:04 was understated and thus, year end financial statements for FY:00 through FY:04 needed to be restated.

64.     On March 15, 2005, the Individual Defendants caused AspenTech to issue a press release reiterating the findings of the Audit Committee investigation disclosed in the January 31, 2005 press release and announcing the completion of the investigation.

65.     On that same day, the Individual Defendants also caused the Company to file its Form 10-K/A for FY:04 and Form 10-Q for 1Q:05 and 2Q:05, which reiterated the investigation's findings and corresponding restatement as more fully discussed herein.

66.     Prior to disclosure of the Audit Committee's investigation and restatement arising there from to the investing public, AspenTech: (i) acquired ICARUS using its overvalued shares as partial consideration; (ii) completed a private placement of its common stock for gross proceeds of approximately $30 million; (iii) completed a private placement of its common stock for gross proceeds of approximately $50 million and used those proceeds to acquire Hyprotech[1]; and (iv) recorded license revenue that enabled the Company to sign a definitive agreement for $100 million in private equity financing on favorable terms.

---

1 In August 2003, the Federal Trade Commission ("FTC") announced it had filed charges against AspenTech for anticompetitive activities in connection with its acquisition of Hyprotech in May 2002. A Final Decision and Order was issued by the FTC on December 20, 2004, ordering AspenTech to divest itself of all software assets acquired from Hyprotech. On December 23, 2004, the Individual Defendants caused the Company to issue a press release announcing a settlement and agreement with Honeywell, the acquirer of AspenTech's intellectual property of Hyprotech. AspenTech's legal battles with FTC resulted in a cumulative loss of $64.6 million in restructuring and legal costs for FY:04 and FY:03.

## IMPROPER STATEMENTS

65.    Throughout FY:00, the Individual Defendants caused AspenTech to file its Form 10-Q statements for 1Q:00 on November 15, 1999, 2Q:00 on December 31, 1999 and 3Q:00 on March 31, 2000.  These Form 10-Qs documented AspenTech's financial results for the respective quarters and were all signed by defendant Zappala.

66.    On August 8, 2000, the Individual Defendants caused the Company to issue a press release announcing its financial results for 4Q:00 and FY:00, the period ending June 30, 2000.  For the fiscal year, excluding one-time charges, AspenTech reported total revenues of $268.1 million and net income of $6.5 million or $0.21 per diluted share.  Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

We are pleased to have exceeded our goals for both growth and profitability in the fourth quarter and fiscal year.  The rapid growth in our license revenues continued to be driven by strong demand for our integrated Enterprise Optimization(TM) and supply chain solutions, as process manufacturers increasingly invest in technology to improve their manufacturing productivity and optimize their supply chains.  We are unique in the industry as the only company with a proven integrated solution, and our domain expertise and process knowledge enable us to deploy mission-critical solutions that other vendors cannot provide.

In the fourth quarter, we saw good strength across multiple process industry sectors, geographies, and product offerings.  In addition to a number of significant fourth quarter Enterprise Optimization transactions, we won a highly competitive, enterprise-wide supply chain deal with BP Chemicals, as well as several other large supply chain deals, extending our position as the market leader for process industry supply chain implementations.  We are pleased with the performance of our supply chain solutions this past year, where license revenue more than doubled, and we are excited about our prospects for the year ahead.

As we move into fiscal 2001, we believe we are strategically positioned to provide critical technologies that will allow process manufacturers to seamlessly link to digital e-marketplaces and participate in direct materials procurement over the Internet.  In this way, we are confident we can offer a customer annual savings that will often exceed tens of millions of dollars by streamlining their business processes and optimizing their operations.

67.    AspenTech's financial results for 4Q:00 and FY:00, the period ending June 30, 2000, were repeated in the Company's Report on Form 10-K405, signed by defendants Evans and Zappala,

among others, and filed with the SEC on or about September 28, 2000. Concerning the Company's revenue recognition policies, the 10-K405 stated, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

> Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

70.    On September 5, 2000, the Individual Defendants caused the Company to announce that it closed a transaction to acquire ICARUS, the market leader in providing software that is used by the process manufacturing industries to estimate plant capital costs and evaluate project economics for $24.5 million in a combination of cash and stock.

71.    On October 24, 2000, the Individual Defendants caused AspenTech to issue a press release announcing its financial results for 1Q:01, the period ending September 30, 2000. For the quarter, the Individual Defendants caused the Company to report total revenues of $69.5 million and, excluding the one-time in-process research and development charge, the Company reported a net

- 25 -

loss of $0.2 million or $0.01 per share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> Our supply chain solutions were a primary driver of our growth in the first quarter, as we won a number of important deals in our target markets. In addition, we saw a strong contribution from our Aspen Engineering Suite. We are also continuing to gain momentum in the process industries as the only e-business software vendor with an end-to-end solution that integrates all facets of a corporation and its extended enterprise, from the digital marketplace to the plant floor.

> In the first quarter, we announced several important initiatives to help our customers address the critical areas of their e-business strategies: improve their internal processes with our infrastructure solutions such as Plantelligence and eSupply Chain suite, connect seamlessly to e-marketplaces using our netmarket solution and tie in external business partners through our B2B Foundation solution.

72.    AspenTech's financial results for 1Q:01, the period ending September 30, 2000, were repeated in the Company's Report on Form 10-Q, signed by defendant Zappala, and filed with the SEC on or about November 14, 2000. Concerning the Company's recognition policies, the Individual Defendants caused the 10-Q to state, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

> Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting

and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

73.    On January 24, 2001, the Individual Defendants caused the Company to issue a press release announcing its financial results for 2Q:01, the period ending December 31, 2000. For the quarter, the Individual Defendants caused the Company to report total revenues of $81.7 million and, excluding amortization of goodwill, in-process research and development and write-off of investments, net income of $3.1 million, or $0.10 per diluted share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> We were pleased to see continued strong license revenue growth this quarter across a broad base of business. Our supply chain and engineering applications were the largest contributors in the quarter, with the petroleum sector again being the strongest segment of our end-user customer markets. Services revenue and profitability showed dramatic year-over-year improvement as a result of investments we have made to expand our supply chain implementation capacity and productivity.

> We are steadily gaining market share among process manufacturers worldwide as customers continue to standardize on our best-in-class technologies and recognize our differentiated position in the industry. As we move into the second half of the fiscal year, we are excited about our growth prospects and the opportunity to enhance our position as the leading e- business solutions provider for the process industries.

74.    AspenTech's financial results for 2Q:01, the period ending December 31, 2000, were repeated in the Company's Report on Form 10-Q, signed by defendant Zappala, and filed with the SEC on or about February 14, 2001. Concerning the Company's revenue recognition policies, the Individual Defendants caused the 10-Q to state, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and

27

subsequently recognized when earned. The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

75.    On April 24, 2001, the Individual Defendants caused the Company to issue a press release announcing its financial results for 3Q:01, the period ending March 31, 2001.  For the quarter, the Individual Defendants caused the Company to report total revenues of $76.4 million and, excluding expenses relating to PetroVantage and amortization of goodwill, an AspenTech subsidiary providing software to optimize the trading and logistics of crude oil and refined products, a pro forma net loss of $3.2 million or $0.11 per basic share.  Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

We saw a number of customers make significant investments in our technology during the quarter because of the tremendous value our solutions provide, closing ten deals that were greater than $1 million with customers such as Air Liquide, ConAgra Beef, Dupont, Mitsui Chemicals and PetroCanada.  However, due to the uncertainty surrounding the economy, we saw a number of customers delay making software purchasing decisions at the end of March, which caused a shortfall in license revenues.

In response to the current economic environment, we are taking steps to reduce our expenses, which we believe will help us to return to profitability in the near-term.  We will continue to focus on initiatives that will drive our future growth, further our technology leadership position and advance our excellence in customer support.  We expect to resume higher levels of investment when growth rates return to more attractive levels.  Over the long term, AspenTech remains strategically positioned to deliver solutions that drive extraordinary value for our customers in the process industries because of the breadth of our solutions, our unparalleled domain

28

expertise and the dramatic and the proven returns-on-investment our technology provides.

76.    AspenTech's financial results for 3Q:01, the period ending March 31, 2001, were repeated in the Company's Report on Form 10-Q, signed by defendant Zappala, and filed with the SEC on or about May 15, 2001. Concerning the Company's revenue recognition policies, the Individual Defendants caused the 10-Q to state, in pertinent part, as follows:

License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is

provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

77.     On August 7, 2001, the Individual Defendants caused the Company to issue a press release announcing its financial results for 4Q:01 and FY:01, the period ending June 30, 2001. For the quarter, the Individual Defendants caused the Company to report total revenues of $83.0 million and, excluding charges and expenses relating to PetroVantage, the company's wholly owned subsidiary providing software to optimize the trading and logistics of crude oil and refined products, pro forma net income of $0.4 million or $0.01 per diluted share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> We are pleased to have exceeded expectations for both revenues and profitability this quarter in what remains a very difficult environment. During the quarter, we solidified our leadership position in the process industries with the launch of Aspen ProfitAdvantage(TM), which focuses on profit improvement strategies for our customers, and the creation a new alliance with Accenture. In addition, Rohm & Haas standardized on our manufacturing and supply chain planning technologies and we closed significant multimillion dollar transactions with Jacobs Engineering, Pemex, SASOL in South Africa, Valero Refining and Yukos, a large Russian oil company. However, we continued to see customers delay software purchases at the end of the quarter, which limits our near-term visibility.

> In light of economic uncertainties, we anticipate making additional expense reductions to improve our efficiency and return to profitability as soon as possible. These actions include reducing our worldwide workforce, which numbered 1,900 at the end of June, by approximately 5 percent. Our management team has valuable experience executing in difficult environments, which we believe will help us to maintain our leadership in providing enterprise-wide software solutions to process manufacturers.

78.     AspenTech's financial results for 4Q:01 and FY:01, the period ending June 30, 2001, were repeated in the Company's Report on Form 10-K, which was signed by defendants Evans and Zappala, among others, and filed with the SEC on or about September 28, 2001. Concerning the Company's revenue recognition policies, the Individual Defendants caused the 10-Q to state, in pertinent part, as follows:

**Revenue Recognition**

The Company recognizes revenue in accordance with Statement of Position (SOP) No. 97-2, "Software Revenue Recognition," as amended and interpreted. License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

79.    On October 25, 2001, the Individual Defendants caused the Company to issue a press release announcing its financial results for 1Q:02, the period ending September 30, 2001. For the

quarter, the Individual Defendants caused the Company to report total revenues of $61.2 million, with services revenues of $42.0 million and license revenues of $19.2 million, and a pro forma loss of $12.5 million or $0.39 per share, which excludes a one-time restructuring charge. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> An uncertain economic environment, combined with the impact of the September 11th attacks, negatively affected our close rate for a number of software license deals at the end of September. Due to slower activity during the summer months, a larger portion of our first quarter revenues close in September, which made last month's terrorist attacks particularly disruptive to several end of quarter transactions in an already challenging business climate. Fortunately, these license delays were largely offset by stronger than expected services revenues, where we continued to maintain gross margins in excess of forty percent, and by carefully controlled spending.

> Some of our largest customers have expressed intentions to close significant license transactions in the second quarter. These indications make us cautiously optimistic, as customers focus on spending year end budget surpluses in an environment where some of our end user markets are showing early signs of stabilizing. We believe that stronger license revenues and continued operating efficiencies from our previously announced cost cutting efforts will enable us to approach breakeven operations in the second quarter.

Defendant Zappala added, in pertinent part, as follows:

> Our strong services revenue and expanding services backlog, which increased to $125 million this quarter, are indicative of continued investment by our customers in our solutions. This investment gives us confidence that demand for our software solutions will improve in the coming months, as these major transactions are evidence of the compelling return on investment that AspenTech's solutions provide.

80.    AspenTech's financial results for 1Q:02, the period ending September 30, 2001, were repeated in the Company's Report on Form 10-Q, signed by defendant Zappala, and filed with the SEC on or about November 14, 2001. Concerning the Company's revenue recognition policies, the Individual Defendants caused 10 Q to state, in pertinent part, as follows:

> The Company recognizes revenue in accordance with Statement of Position (SOP) No. 97 2, "Software Revenue Recognition," as amended and interpreted. License revenue, including license renewals, consists principally of revenue earned under fixed term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based

upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98 9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed price contracts are recognized using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

81.    On January 23, 2002, the Individual Defendants caused the Company to issue a press release announcing its financial results for 2Q:02, the period ending December 31, 2001.  For the quarter, the Individual Defendants caused the Company to report total revenues of $81.9 million and earnings per share, excluding expenses of the PetroVantage investment, of $0.06 in the quarter. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

In spite of an economy that continues to be challenging, I am very pleased with our performance this quarter as revenue growth significantly exceeded our expectations. A key factor in this performance was a significant rebound in our business from the chemicals industry, as customers made major investments in our solutions to improve their productivity and profitability. In addition to the chemicals industry, continued strength in the petroleum and pharmaceutical sectors enabled us to achieve a greater revenue contribution from larger license transactions, which had not occurred in the past few quarters.

We were also pleased with our transaction with Dow Chemical, which represents a milestone agreement for AspenTech, as Dow looks to leverage its ERP investment and improve its manufacturing efficiency. We believe that this agreement validates the strength of our solution for enabling process manufacturers to integrate their manufacturing processes with their enterprise wide supply chains. As we look ahead, we remain confident about our prospects in the coming quarters and we believe we are well positioned for growth and profitability.

82.     AspenTech's financial results for 2Q:02, the period ending December 31, 2001, were repeated in the Company's Report on Form 10-Q, which was signed by defendant Zappala and filed with the SEC on or about February 14, 2002. Concerning the Company's revenue recognition policies, the Individual Defendants caused the 10-Q to state, in pertinent part, as follows:

License revenue, including license renewals, consists primarily of revenue earned under fixed term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customer when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probably that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license agreements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98 9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair market value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

34

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed price contracts are recognized using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

83.     On February 7, 2002, the Individual Defendant's caused the Company to issue a press release announcing that it had completed a private placement of redeemable convertible preferred stock from which the Company received gross proceeds of $30.0 million.

84.     On April 25, 2002, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 3Q:02, the period ending March 31, 2002.  For the quarter, the Individual Defendant's caused the Company to report total revenues of $83.5 million and an operating loss of $6.9 million, resulting in a pro forma loss of $0.15 per diluted share.  Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

We are one hundred percent committed to doing whatever it takes to restore AspenTech to sustained profitability.  Due to the current economic environment, we have taken difficult, but necessary, short term actions that should enable us to make money in the current quarter.  Our fourth quarter is seasonally our strongest and we possess a robust pipeline of sales opportunities that we believe will close by the end of June.

In addition, we have implemented a number of strategic and tactical programs that we believe will enhance our profitability longer term.  In recent months, we have significantly strengthened our balance sheet and expanded our partner relationship with Accenture to deliver enterprise wide software solutions.  Our product offering, competitive position and the value we deliver to our customers have never been stronger.  Given these factors, we feel confident that in a moderate economic expansion our revenue and earnings growth will provide investors attractive returns.

35

85.     AspenTech's financial results for 3Q:02, the period ending March 31, 2002, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2002, which was signed by defendant Zappala.  Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10 Q to state, in pertinent part, as follows:

> License revenue, including license renewals, consists primarily of revenue earned under fixed term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customer when the Company sells its consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license agreements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98 9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair market value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

> Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

> Service revenues from fixed price contracts are recognized using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenues are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as

36

unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated condensed balance sheets.

86.    On May 10, 2002, the Individual Defendant's caused the Company to issue a press release announcing that it had agreed to a private placement of common stock to a small group of current institutional and new individual investors, raising gross proceeds of approximately $50 million of its cash on hand, to fund the acquisition of Hyprotech, a leading supplier of process simulation and engineering software and services to the petroleum industry.

87.    On August 15, 2002, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 4Q:02 and FY:02, the period ending June 30, 2002. For the quarter, the Individual Defendant's caused the Company to report total revenues of $84.0 million and a pro forma net loss of $11.7 million, or $0.34 per share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> We have taken aggressive actions intended to return us to operating profitability and positive cash flow by the end of this calendar year. In the near term, we have cut expenses to breakeven at quarterly revenue of $88 million. We have also sharpened our focus on two core product lines: Engineering and Supply Chain Manufacturing. This streamlined approach will enable us to better match revenue and spending until the IT spending environment strengthens, while maintaining our key customer support and development activities.

> We have also made significant changes in our sales and product development leadership and improved our organizational efficiency. We believe this will add more predictability to our financial results, while allowing us to develop and market our solutions more rapidly and efficiently. AspenTech's reputation for technical excellence and process industry expertise has never been stronger, and in the year ahead we are committed to delivering financial results that reflect this valuable industry leadership.

88.    AspenTech's financial results for 4Q:02 and FY:02, the period ending June 30, 2002, were repeated in the Company's Report on Form 10-K filed with the SEC on or about September 30, 2002, which was signed by defendants Evans and Zappala, among others. Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10 K to state, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed term and perpetual software license agreements and is generally

37

recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when the Company sells its consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98 9, "Modification of SOP 97 2, Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include telephone support and unspecified rights to product upgrades and enhancements. These services are typically sold for a one year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed price contracts are recognized using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

89.    On October 24, 2002, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 1Q:03, the period ending September 30, 2002.  For the quarter, the Individual Defendant's caused the Company to report total revenues of $77.3 million and

a net loss of $10.7 million, or $0.28 per share. Defendant McQuillin commented on the Company's

performance, stating, in pertinent part, as follows:

> Our new organization, which is focused around our two major product lines,
> has helped to streamline our operations and will set the foundation for improved
> efficiency in the coming quarters.  We achieved our expense reduction targets across
> the company, cutting spending to $88 million in the first quarter.  Our Engineering
> business hit our revenue targets and was profitable in the quarter.  However, our
> Manufacturing/Supply Chain business fell short and did not meet our expectations.
> While we saw solid results from our foundation products, demand for our integrated,
> enterprise products continued to be weak.

> As a result, we are realigning our expenses within the Manufacturing/Supply
> Chain business to focus on near term opportunities. These actions are intended to
> restore the Manufacturing/Supply Chain business, and AspenTech as a whole, to
> profitability in the third quarter of fiscal 2003.  Since we will only achieve a partial
> quarter of benefits in the current quarter, our target is to break even for the three
> months ending December 31, 2002.

90.     AspenTech's financial results for 1Q:03, the period ending September 30, 2002, were

repeated in the Company's Report on Form 10-Q filed with the SEC on or about November 14, 2002,

which was signed by defendants McQuillin and Zappala.  Concerning the Company's revenue

recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as

follows:

**Revenue Recognition Software Licenses**

> We recognize software license revenue in accordance with American Institute
> of Certified Public Accountants (AICPA) Statement of Position, or SOP, No. 97 2,
> "Software Revenue Recognition", as amended by SOP No. 98 4 and SOP No. 98 9,
> as well as the various interpretations and clarifications of those statements. These
> statements require that four basic criteria must be satisfied before software license
> revenue can be recognized: persuasive evidence of an arrangement between
> ourselves and a third party exists; delivery of our product has occurred; the sales
> price for the product is fixed or determinable; and collection of the sales price is
> probable.

> Our management uses its judgment concerning the satisfaction of these
> criteria, particularly the criteria relating to the determination of whether the fee is
> fixed and determinable and the criteria relating to the collectibility of the receivables
> relating to such sales. Should changes and conditions cause management to
> determine that these criteria are not met for certain future transactions, all or

substantially all of the software license revenue recognized for such transactions could be deferred.

**Revenue Recognition Consulting Services**

We recognize revenue associated with fixed fee service contracts in accordance with AICPA SOP No. 81 1, "Accounting for Performance of Construction Type and Certain Production Type Contracts", using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors, including the experience of the personnel that are performing the services and the overall complexity of the project. Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected.

91.    On January 30, 2003, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 2Q:03, the period ending December 31, 2002.  For the quarter, the Individual Defendant's caused the Company to report total revenues of $83.0 million and a net loss of $136.9 million, or $3.59 per share.  Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

We met or exceeded all of our key operational objectives in the December quarter, which enabled us to restore the company to operating profitability, excluding charges, a quarter earlier than we anticipated.  Solid customer demand, particularly in the refining and oil & gas sectors, coupled with improved execution, led to sequential top line growth. Expenses were down substantially from last quarter, as we realized the benefit of headcount reductions and cost control measures implemented earlier in the year.

In addition, we ended the quarter with more cash than we had forecasted, due to an increase in the sale of installment receivables and improved collection activity. Our success in the second quarter was an important milestone for the company and gives us confidence that we can sustain this improved execution, as we move toward achieving our revenue and profitability targets for the rest of this fiscal year.

92.    AspenTech's financial results for 2Q:03, the period ending December 31, 2002, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about February 14, 2003, which was signed by defendants McQuillin and Zappala.  Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as follows:

**Revenue Recognition Software Licenses**

We recognize software license revenue in accordance with American Institute of Certified Public Accountants (AICPA) Statement of Position, or SOP, No. 97 2, "Software Revenue Recognition", as amended by SOP No. 98 4 and SOP No. 98 9, as well as the various interpretations and clarifications of those statements. These statements require that four basic criteria must be satisfied before software license revenue can be recognized: persuasive evidence of an arrangement between ourselves and a third party exists; delivery of our product has occurred; the sales price for the product is fixed or determinable; and collection of the sales price is probable.

Our management uses its judgment concerning the satisfaction of these criteria, particularly the criteria relating to the determination of whether the fee is fixed and determinable and the criteria relating to the collectibility of the receivables relating to such sales. Should changes and conditions cause management to determine that these criteria are not met for certain future transactions, all or substantially all of the software license revenue recognized for such transactions could be deferred.

**Revenue Recognition Consulting Services**

We recognize revenue associated with fixed fee service contracts in accordance with AICPA SOP No. 81 1, "Accounting for Performance of Construction Type and Certain Production Type Contracts", using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors, including the experience of the personnel that are performing the services and the overall complexity of the project. Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected.

93.     On April 29, 2003, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 3Q:03, the period ending March 31, 2003.  For the quarter, the Individual Defendant's caused the Company to report total revenues of $79.7 million and a net loss to common shareholders of $2.0 million, or $0.05 per share.  Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

I am pleased to have met our financial objectives again this quarter, particularly in a difficult macroeconomic environment.  We hit our license revenue target, further reduced our operating expenses, and significantly improved pro forma

profitability. This sequential improvement is solid evidence that the actions we took last autumn to streamline both our organization and our product focus are having a positive effect on our execution, which is enabling us to operate profitably.

In terms of the key operational highlights, the geographic composition of our license revenue was well balanced and our Engineering product line exceeded its objectives. We continue to see steady demand for our Manufacturing/Supply Chain solutions, although primarily for individual Foundation technologies. From an end user perspective, the petroleum refining and oil and gas sectors were again important contributors in the third quarter, as integrated refiners sought to optimize their asset productivity and upstream divisions launched large engineering projects. Major customers continue to express their confidence in our solutions for Enterprise Operations Management, which provide proven, rapid, and substantial returns on investment, enabling customers to consistently improve their profitability.

94.    AspenTech's financial results for 3Q:03, the period ending March 31, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2003, which was signed by defendants McQuillin and Zappala. Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as follows:

**Revenue Recognition Software Licenses**

We recognize software license revenue in accordance with American Institute of Certified Public Accountants (AICPA) Statement of Position, or SOP, No. 97 2, "Software Revenue Recognition", as amended by SOP No. 98 4 and SOP No. 98 9, as well as the various interpretations and clarifications of those statements. These statements require that four basic criteria must be satisfied before software license revenue can be recognized: persuasive evidence of an arrangement between ourselves and a third party exists; delivery of our product has occurred; the sales price for the product is fixed or determinable; and collection of the sales price is probable.

Our management uses its judgment concerning the satisfaction of these criteria, particularly the criteria relating to the determination of whether the fee is fixed and determinable and the criteria relating to the collectibility of the receivables relating to such sales. Should changes and conditions cause management to determine that these criteria are not met for certain future transactions, all or substantially all of the software license revenue recognized for such transactions could be deferred.

**Revenue Recognition Consulting Services**

We recognize revenue associated with fixed fee service contracts in accordance with AICPA SOP No. 81 1, "Accounting for Performance of

42

Construction Type and Certain Production Type Contracts", using the percentage of completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors, including the experience of the personnel that are performing the services and the overall complexity of the project. Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected.

95.    On August 7, 2003, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 4Q:03 and FY:03, the period ending June 30, 2003. For the quarter, the Individual Defendant's caused the Company to report total revenues of $82.8 million and a net loss to common shareholders of $18.2 million, or $0.47 per share. Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

> Our fourth quarter sequential license growth was driven by a substantial increase in contribution from our manufacturing/supply chain solutions, which exceeded our expectations for the first time in fiscal 2003. Our performance was well balanced by geography and end user market  a testament to improved sales force productivity. We believe this validates our actions over the past year to streamline our operations and enhance our organizational leadership.

> I am very proud of the dramatic turnaround the company has made over the past nine months, improving operational performance in the midst of a very difficult environment for enterprise software providers. The best evidence of this improvement was the signing of a definitive agreement with Advent International for a $100 million private equity financing, which is subject to shareholder approval. We believe these financial resources will help us to show year on year improvement in earnings and cash flow in fiscal 2004.

96.    On August 13, 2003, the Individual Defendant's caused the Company to issue a press release announcing the results of voting at its special meeting of stockholders. At the special meeting, stockholders approved the Company's proposed $100 million private equity investment from funds managed by Advent International Corporation.

97.    AspenTech's financial results for 4Q:03 and FY:03, the period ending June 30, 2003, were repeated in the Company's Report on Form 10-K filed with the SEC on or about September 29, 2003, which was signed by defendants McQuillin and Kane, among others. Concerning the

Company's revenue recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when the Company sells its consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98 9, "Modification of SOP 97 2, Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenues are recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

> Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include telephone support and unspecified rights to product upgrades and enhancements. These services are typically sold for a one year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

> Service revenues from fixed price contracts are recognized using the proportional performance method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated

balance sheets. In accordance with the Emerging Issues Task Force (EITF) released Issue No. 01 14, "Income Statement Characterization of Reimbursements Received for "Out of Pocket' Expenses Incurred," reimbursement received for out of pocket expenses is recorded as revenue and not as a reduction of expenses.

98.    On October 29, 2003, the Individual Defendant's caused AspenTech to issue a press release announcing its financial results for 1Q:04, the period ending September 30, 2003.  For the quarter, the Individual Defendant's caused the Company to report total revenues of $77.0 million and diluted earnings per share to common shareholders of $0.10 per share.  Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

> We are extremely pleased to have delivered profitability in the first quarter, which is our seasonally weakest quarter.  These results indicate that our focus on improving execution and financial performance is yielding success. With the closing of our private equity financing, a substantial reduction of outstanding debt, and the generation of positive cash flow from operations, we have dramatically improved our balance sheet and put the company in a position to capitalize on improving IT demand in the process industries.

> We recently introduced a number of new products for the Enterprise Operations Management (EOM) market with some of our largest customers. We are encouraged by both the growth prospects for these solutions, as well as the demonstrable uptick in customer interest to deploy these types of applications. Given our improved operational execution and lower quarterly expenses, we are positioned to continue our progress and deliver on our objectives for this fiscal year.

99.    AspenTech's financial results for 1Q:04, the period ending September 30, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about November 14, 2003, which was signed by defendants McQuillin and Kane.  Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as follows:

**Revenue Recognition Software Licenses**

> We recognize software license revenue in accordance with American Institute of Certified Public Accountants (AICPA) Statement of Position, or SOP, No. 97 2, "Software Revenue Recognition," as amended by SOP No. 98 4 and SOP No. 98 9, as well as the various interpretations and clarifications of those statements. These statements require that four basic criteria must be satisfied before software license revenue can be recognized: persuasive evidence of an arrangement between ourselves and a third party exists; delivery of our product has occurred; sales price for the product is fixed or determinable; and collection of the sales price is probable.

45

Our management uses its judgment concerning the satisfaction of these criteria, particularly the criteria relating to the determination of whether the fee is fixed and determinable and the criteria relating to the collectibility of the receivables, particularly the installments receivable, relating to such sales. Should changes and conditions cause management to determine that these criteria are not met for certain future transactions, all or substantially all of the software license revenue recognized for such transactions could be deferred.

### Revenue Recognition Consulting Services

We recognize revenue associated with fixed fee service contracts in accordance with the proportional performance method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors including the experience of the personnel that are performing the services and the overall complexity of the project. Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected.

100.    On January 22, 2004, the Individual Defendant's caused AspenTech to issue a press release announcing its financial results for 2Q:04, the period ending December 31, 2003. For the quarter, the Individual Defendant's caused the Company to report total revenues of $80.4 million and net income of $560,000, or $0.01 per diluted share. Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

During the second quarter, we continued to build upon the operational performance and financial foundation that we worked hard to establish at AspenTech over the previous four quarters. With the significant structural changes behind us, we have now turned our full attention to focusing on the execution of our business strategy to deliver sustainable, profitable growth for our shareholders. With economic indicators steadily improving, we are beginning to see pockets of strength in our customer base and we are moving aggressively to capitalize on these opportunities.

Our strategy to deliver business value with vertical software solutions to the emerging enterprise operations management (EOM) market is gaining momentum. We are encouraged by our customers' response to the benefits they are receiving from some of our newer products such as Aspen Operations Manager. We have also added new functionality to our supply chain planning solutions over the past year which has strengthened demand for this technology from the petroleum, chemicals and consumer goods markets.

101.    AspenTech's financial results for 2Q:04, the period ending December 31, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about February 17, 2004, which was signed by defendants McQuillin and Kane.    Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as follows:

**Revenue Recognition Software Licenses**

We recognize software license revenue in accordance with American Institute of Certified Public Accountants (AICPA) Statement of Position, or SOP, No. 97 2, "Software Revenue Recognition," as amended by SOP No. 98 4 and SOP No. 98 9, as well as the various interpretations and clarifications of those statements. These statements require that four basic criteria must be satisfied before software license revenue can be recognized: persuasive evidence of an arrangement between ourselves and a third party exists; delivery of our product has occurred; the sales price for the product is fixed or determinable; and collection of the sales price is probable.

Our management uses its judgment concerning the satisfaction of these criteria, particularly the criteria relating to the determination of whether the fee is fixed and determinable and the criteria relating to the collectibility of the receivables, particularly the installments receivable, relating to such sales. Should changes and conditions cause management to determine that these criteria are not met for certain future transactions, all or substantially all of the software license revenue recognized for such transactions could be deferred.

**Revenue Recognition Consulting Services**

We recognize revenue associated with fixed fee service contracts in accordance with the proportional performance method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors including the experience of the personnel that are performing the services and the overall complexity of the project. We have a significant amount of experience in the estimation of the total costs to complete a contract and have not typically recorded material losses related to these estimates. We do not expect the accuracy of our estimates to change significantly in the future. Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected.

47

102.    On April 29, 2004, the Individual Defendant's caused the Company to issue a press release which announced its financial results for 3Q:04, the period ending March 31, 2004. For the quarter, the Individual Defendant's caused the Company to report total revenues of $80.7 million and net income of $1.5 million, or $0.03 per diluted share. Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

> The strength of our business in the chemicals and oil & gas industries, combined with continued operational execution, enabled us to meet or exceed our quarterly targets for revenue and net income for the sixth consecutive quarter. We continue to see modest improvements in the global economic environment and our customer base is actively looking to invest in IT solutions that support their corporate wide initiatives to improve operational performance.

> During the past nine months, we have released nine new products, which we believe will fuel our future growth. Now, our challenge as a company is to focus on capturing the growth opportunities of these new products, as well as maximize the performance of our existing point solutions. As we build our sales pipeline for these products, we plan to reallocate organizational resources into sales and marketing activities that support our plans for profitable, sustainable growth in fiscal 2005 and beyond.

Defendant Kane continued, in pertinent part, as follows:

> The company has made significant strides in consistently meeting or exceeding our operational targets and improving our financial performance, as evidenced by the year over year increase in our operating margins. As we seek to grow our revenues and hit our long term operating margin goals, it is necessary to maintain our focus on operational improvement and invest in the areas of the business that will produce the greatest growth opportunities.

103.    AspenTech's financial results for 3Q:04, the period ending March 31, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 17, 2004, which was signed by defendants McQuillin and Kane. Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10-Q to state, in pertinent part, as follows:

**Revenue Recognition Software Licenses**

> We recognize software license revenue in accordance with American Institute of Certified Public Accountants, or AICPA, Statement of Position, or SOP, No. 97 2, "Software Revenue Recognition," as amended by SOP No. 98 4 and SOP No. 98 9, as well as the various interpretations and clarifications of those statements. These

48

statements require that four basic criteria must be satisfied before software license revenue can be recognized: persuasive evidence of an arrangement between ourselves and a third party exists; delivery of our product has occurred; the sales price for the product is fixed or determinable; and collection of the sales price is probable.

Our management uses its judgment concerning the satisfaction of these criteria, particularly the criteria relating to the determination of whether the fee is fixed and determinable and the criteria relating to the collectibility of the receivables, particularly the installments receivable, relating to such sales. Should changes and conditions cause management to determine that these criteria are not met for certain future transactions, all or substantially all of the software license revenue recognized for such transactions could be deferred.

**Revenue Recognition Consulting Services**

We recognize revenue associated with fixed fee service contracts in accordance with the proportional performance method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors including the experience of the personnel that are performing the services and the overall complexity of the project. We have a significant amount of experience in the estimation of the total costs to complete a contract and have not typically recorded material losses related to these estimates. We do not expect the accuracy of our estimates to change significantly in the future. Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected.

104.    On August 4, 2004, the Individual Defendant's caused the Company to issue a press release announcing its financial results for 4Q:04 and FY:04, the period ending June 30, 2004.  For the quarter, the Individual Defendant's caused the Company to report total revenues of $87.6 million and a net loss of $41.4 million, or $1.00 per diluted share.  Defendant McQuillin commented on the Company's performance, stating, in pertinent part, as follows:

The fundamentals of our business continue to remain solid. We delivered our fifth straight quarter of software license growth and, for the first time since June 1998, generated pro forma (non GAAP) operating margins for the quarter in the double digits.  Our sales were balanced by both industry and product mix, as we experienced strength from each of the chemicals, petroleum, and oil & gas markets. Additionally, our manufacturing/supply chain product line had its strongest performance in the past two years.

With the potential approval of the Federal Trade Commission (FTC) settlement, we would remove a major external issue that has distracted us from focusing on our business over the past two years. Our attention has now turned to building on our momentum and increasing our operating margins for fiscal 2005. We indicated at the beginning of this year that we would continue to focus our efforts on bringing all of our products together to provide an integrated solution for the Enterprise Operations Management market. The execution of this integration strategy has enabled us to streamline many of our internal processes to drive costs out of the business, as well as curtail our investment in certain products. These changes will enable us to increase our productivity and efficiency, while driving earnings growth in fiscal 2005.

I am proud of the dramatic improvements we have made in the financial performance of the company for fiscal 2004.  As we approach AspenWorld, the process industry conference we host every two years, we are excited about our opportunity to showcase how our new, integrated solutions can help customers improve their business processes and capture significant economic value.

Defendant Kane continued, in pertinent part, as follows:

During fiscal 2004 we increased our pro forma (non GAAP) operating income to $27.0 million from $2.5 million in fiscal 2003, reduced our debt by over $100 million, and generated $41 million in cash flow from operations.  This improvement has been the result of software license revenue growth of nine percent, the reduction of total recurring expenses by more than $21 million, and lowering our DSOs for billed receivables in the fourth quarter to 54 days, a 31 day year over year improvement. We are extremely pleased with this performance and anticipate that over the next twelve months we will generate significantly higher operating margins and have a debt free balance sheet by the end of fiscal 2005.

105.     AspenTech's financial results for 4Q:04 and FY:04, the period ending June 30, 2004, were repeated in the Company's Report on Form 10-K filed with the SEC on or about September 13, 2004, which was signed by defendants McQuillin and Kane.  Concerning the Company's revenue recognition policies, the Individual Defendant's caused the 10K to state, in pertinent part, as follows:-

License revenue, including license renewals, consists principally of revenue earned under fixed term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) of fair value exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates that the Company charges its customers when the Company sells its consulting services

separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98 9, "Modification of SOP 97 2, Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenues are recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include telephone support and unspecified rights to product upgrades and enhancements. These services are typically sold for a one year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed price contracts are recognized using the proportional performance method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets. In accordance with the Emerging Issues Task Force (EITF) Issue No. 01 14, "Income Statement Characterization of Reimbursements Received for "Out of Pocket' Expenses Incurred," reimbursement received for out of pocket expenses is recorded as revenue and not as a reduction of expenses.

106.    The statements referenced above in &&65-105 were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:  (i) that the Company had improperly and prematurely recognized revenue for certain software license and service agreement transactions entered into with certain alliance partners and other customers during FY:00-FY:04; (ii) that the Company lacked adequate internal

controls and was therefore unable to ascertain its true financial condition; and (iii) that as a result of the foregoing, the values of the Company's revenues, earnings, assets and/or liabilities for FY:00-FY:04 were materially overstated and/or understated and the corresponding financial statements had to be restated.

## REASONS THE STATEMENTS WERE IMPROPER

107.    On October 27, 2004, the Individual Defendant's caused the Company to shock the market when it issued a press release announcing that its Audit Committee had undertaken a detailed review of the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during FY:00-FY:02. The press release continued, in pertinent part, as follows:

> Based on its preliminary review to date, the Audit Committee believes that one software license transaction in fiscal third quarter 2000 and two transactions in fiscal second quarter 2001 were included in AspenTech's results for such periods without reflecting the impacts of associated arrangements between AspenTech and those customers, which may require revised accounting treatment.

> The Committee has also identified a potential contingency associated with a fourth transaction recorded in the fourth fiscal quarter of 2001 which was not reflected in prior accounting, which may require revised accounting treatment.

108.    Upon this shocking news, on October 28, 2004, shares of the Company's stock fell to an intraday low of $5.50 per share, or approximately 20%, before closing at $6.68 per share, on unusually heavy trading volume.

109.    Then, on October 29, 2004, the Individual Defendants caused the Company to announce that federal prosecutors launched a probe into the Company's accounting practices from 2000 through 2002.  The Individual Defendants caused the Company to state it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents relating to transactions that it entered into during those years, and other documents dating from January 1, 1999.

110.    The market once again reacted and shares of the Company's stock fell an additional $0.67, or approximately 10%, to close at $6.01, on unusually heavy trading volume.

111.     On November 18, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Aspen Technology Delays Filing of Form 10-Q and Requests Hearing with NASDAQ Stock Market."  The press release stated in part:

> Aspen Technology, Inc. today announced that due to the delay in filing its Form 10 Q for the period ended September 30, 2004, it has received a letter from The Nasdaq Stock Market indicating that the Company's common stock is subject to delisting pursuant to Nasdaq Marketplace rule, 4310(c)(14). The company has delayed filing its 10 Q due to the ongoing review being conducted by its Audit Committee into the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000 2002. The company had previously announced this review in a press release dated October 27, 2004.
>
> AspenTech will request a hearing before a Nasdaq Listing Qualifications Panel, which will automatically stay the delisting of AZPN common stock pending the panel's review and determination. Until the Panel's final determination and the expiration of any exception granted by the Panel, AspenTech's common stock will continue to be traded on the Nasdaq National Market. However, as a result of the delayed 10 Q filing, the trading symbol for the Company's common stock will be changed from AZPN to AZPNE effective as of the opening of business on Thursday, November 18, 2004.
>
> While the Company is working diligently to complete the preparation and auditor review of its financial statements, there can be no assurance that the Panel will grant the Company's request for an exception that would allow the continued listing of the Company's common stock on the NASDAQ Stock Market. The Company will need to file its Form 10 Q for the quarter ended September 30, 2004 with the Securities and Exchange Commission and meet any other Panel requirements as a condition to obtaining the Panel's approval of continued listing on the NASDAQ Stock Market.
>
> The company also announced today that it intends to delay its Annual Shareholder Meeting, which was originally scheduled for December 7, 2004. A notice of the new meeting date along with the company's proxy statement and annual report will be sent to shareholders in advance of the newly scheduled meeting.

112.     On November 19, 2004, the Individual Defendants caused the Company to issue a press release entitled, "Notice of Delisting or Transfer, Other Events, Financial Statements and Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing."  The press release stated in part:

On November 16, 2004, we received a letter from the NASDAQ Stock Market indicating that we are not in compliance with the NASDAQ requirements for continued listing set forth in Marketplace Rule 4310(c)(14) as a result of our failure to file our Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2004 with the Securities and Exchange Commission.

NASDAQ rules permit us to request a hearing with a NASDAQ Listing Qualifications Panel to appeal NASDAQ's decision to delist our common stock. We intend to make such an appeal. Our common stock will remain listed on the NASDAQ National Market pending the outcome of such appeal.

113.    On November 24, 2004 a press release entitled AAspen to Restate Four Years' Results" was disseminated.  The press release stated in relevant part that AspenTech will:

[R]estate results for the fiscal years ended June 2000 through June 2004 after its audit committee discovered the company improperly accounted for certain software licenses.  The committee identified five relevant transactions it said took place in 2000 and 2001, and range in revenue from $800,000 to $4.3 million. As a result of the accounting treatment used, revenue was overstated for fiscal 2000 and 2001, and understated for fiscal 2002, 2003 and 2004, Aspen said.

Aspen also said chief executive David McQuillin resigned at the board's request, effective immediately. Charles F. Kane, currently chief financial officer, was named interim chief executive.

Aspen said the committee continues to investigate transactions entered into in fiscal years 2000 through 2002, and has decided to evaluate certain agreements entered into in fiscal 2003 and 2004. Aspen said that at this time the committee isn't able to determine when its review will be completed.

114.    On December 9, 2004 the Individual Defendants caused the Company to issue a press release entitled "Aspen Technology Names Mark Fusco President & CEO; Fusco Brings Track Record of Growth Business with Global Customers and Strong Background in Professional Services."  The press release stated in relevant part:

Fusco, who has served on AspenTech's Board of Directors for the past year, will assume his responsibilities at AspenTech effective January 3, 2005.

* * *

"Mark's expertise in building and enhancing relationships with large customers and in selling and implementing complex solutions will be extremely valuable as we seek to increase the adoption of our new aspenONE solutions and make Enterprise Operations Management (EOM) a reality for our customers," said Charles Kane, Chief Financial Officer and Interim CEO of AspenTech.  "Through his active participation on AspenTech's Board, Mark has developed a strong understanding of the company's strengths, as well as its challenges, which will enable him to immediately focus on improving our sales and services efforts."

"Over the past 23 years AspenTech has established a customer franchise and product portfolio that is unmatched in the process industries," said Mark Fusco, incoming President & CEO of AspenTech. "I am very excited about the opportunity to leverage these assets and expand the company's footprint with our major customers. I believe that the company is poised to benefit from the roll-out of our new aspenONE solutions and the process industries' need to improve their operational performance. I look forward to working closely with our employees, customers, partners and shareholders and driving the future direction of this company."

115.    On January 13, 2005, the Individual Defendants caused the Company to issue a

press release entitled "Larry Evans Retires from Aspen Technology's Board of Directors; Evans

Will Continue to Serve as a Senior Advisor to AspenTech After Retiring as Chairman."  The

press release stated in relevant part:

Larry Evans, Chairman of the Company's Board of Directors, has retired from the Board, effective today. Evans, age 70, was the principal founder of AspenTech and served as its Chairman and Chief Executive Officer from 1981-2002, while continuing in his role as Chairman for the past two years. Evans will serve as a Senior Advisor to AspenTech and continue to help provide strategic input to the Company.

While a professor at the Massachusetts Institute of Technology, Evans pioneered the use of process simulation technology. He founded AspenTech as a start-up with eight employees and under his leadership grew the company into the leading supplier of engineering, manufacturing and supply chain software to the process industries. He has received several prestigious awards that have recognized his performance and leadership at AspenTech, including being inducted into the National Academy of Engineering, being named a hightechnology Entrepreneur of the Year by Ernst & Young, and being named a "Hero of Manufacturing" by FORTUNE magazine.

The Company also announced that Stephen Jennings has been elected to succeed Mr. Evans as Chairman on an interim basis. Jennings is Director of the Monitor Group, a Cambridge-based management consulting firm, and presently serves as lead director of the AspenTech Board of Directors.  He has been a Director since 2000.

116.    On or about January 14, 2005, AspenTech filed a current report on Form 8-K, which

was signed by defendant Kane, with the SEC.  The Form 8-K provides as follows:

In our current report on Form 8-K filed with the SEC on November 19, 2004, we reported that we had received a letter, on November 16, 2004, from Nasdaq

55

indicating that we are not in compliance with Nasdaq National Market continued listing requirements as a result of our failure to file our quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2004 with the SEC.  In our current report on Form 8-K filed with the SEC on November 29, 2004, we reported that our previously issued financial statements for our fiscal years ended June 30, 2000 through June 30, 2004 and any related auditor's reports for those periods should no longer be relied upon and that we had scheduled a hearing with the Panel on December 15, 2004 to appeal Nasdaq's determination to delist our common stock.

The Panel's determination to continue the listing of our common stock is subject to a number of conditions, including:

•     On or before February 15, 2005, we must provide to Nasdaq information relating to the result of the review by the audit committee of our board of directors of certain software license and service agreement transactions as described in our current reports on Form 8-K filed with the SEC on October 28, 2004 and November 29, 2004, and a status update on our dealings with the SEC and the U.S. Attorney's Office for the Southern District of New York.

•     On or before March 15, 2005, we must file with the SEC our quarterly reports on Form 10-Q for the fiscal quarters ended September 30, 2004 and December 31, 2004, together with any required restatements of our previously issued financial statements.

•     We must timely file all periodic reports with the SEC and Nasdaq for all reporting periods ending on or before January 31, 2006.  Until those reports are filed, we must comply with all other continued listing requirements during this period.

In the event we fail to demonstrate compliance with these conditions, our common stock may be delisted.

117.     On January 31, 2005, the Individual Defendants caused the Company to issue a press release entitled "Aspen Technology Issues Update to Audit Committee Review."  The press release stated in relevant part:

Aspen Technology, Inc. today announced that its Audit Committee has substantially completed its transactional analysis pursuant to the scope of its previously-announced detailed review of certain software license transactions. ***As a result of its review, the Audit Committee has identified sixteen transactions entered into during fiscal years 2000, 2001 and 2002 that were accounted for improperly***.

The smallest of these transactions involved recorded license revenue of approximately $207,000 and the largest involved recorded license revenue of approximately $4.3 million.  ***Recorded license revenue associated with these sixteen transactions totaled $18.5 million during the fiscal years 2000 through 2002***. Total previously reported revenue for fiscal years 2000 through 2002 was approximately

$915.6 million of which $414.2 million was license revenue. ***The Audit Committee has concluded that the reported license revenue associated with these sixteen transactions was overstated during the fiscal years 2000 through 2002 and was understated during the fiscal years 2003 and 2004. Therefore, the Company's consolidated financial statements for each of its fiscal years ended June 30, 2000 through June 30, 2004 will be restated***.

Additionally, the Audit Committee has determined, based on its assessment of transactional histories, ***that the accounting for software license sales to resellers beginning in the fiscal year ended June 30, 2001 should have been recorded on a sell-through or consignment basis of accounting rather than a sell-in or upfront basis of accounting***. The adjustments associated with these transactions, some of which are also among those sixteen referenced above, will result in the deferral of license revenue from the period in which it was originally recorded to the period in which the products were sold by the reseller to end users.

License revenues potentially subject to restatement associated with reseller transactions as originally recorded were approximately $16.8 million in fiscal year 2001, $11.0 million in fiscal year 2002, $0.3 million in fiscal year 2003, and $0.4 million in fiscal year 2004. Total previously reported revenue in fiscal year 2001 was $326.9 million, of which $147.4 million was license revenue; total previously reported revenue in fiscal year 2002 was $320.6 million, of which $133.9 million was license revenue; total previously reported revenue in fiscal year 2003 was $322.7 million, of which $139.9 million was license revenue; and total previously reported revenue in fiscal year 2004 was $325.7 million, of which $152.3 million was license revenue.

\* \* \*

The Committee also notes that the Company is assessing the impact of a change in application of Japanese tax law which would have the effect of reducing approximately $1.5 million in previously preliminarily announced license revenue and income in the first fiscal quarter of fiscal year ending June 30, 2005 and increasing income in the third fiscal quarter of fiscal year ended June 30, 2004 by approximately $1.5 million.

The Company presently expects that on or before March 15, 2005, it will file its Form 10-Q for the quarter ended December 31, 2004, its Form 10-Q for the quarter ended September 30, 2004, and its amended Form 10-K/A for the fiscal year ended June 30, 2004. Although the Company is making every effort to make these required filings by March 15, 2005, there can be no assurance that the Company will file these S.E.C. documents by March 15th.

Because the investigation is ongoing, and because the scope of its work is subject to continuing review, the Committee may have further assessments of these and any other transactions it reviews, and is assessing associated Company controls and practices. Consequently, the final results of the Committee's review may vary materially from this assessment.

118.    On March 15, 2005, the Individual Defendants caused the Company to issue a press release entitled "Aspen Technology Announces Completion of Audit Committee Investigation and filing of Restated Annual Report with SEC."  The press release stated in relevant part:

> [T]he Audit Committee of the Company's Board of Directors has completed its previously announced financial review and *the Company has restated its financials for each of the fiscal years ended June 30, 2000 through June 30, 2004*. In connection with the restatement, the Company has filed with the Securities and Exchange Commission an amendment to its Annual Report on Form 10-K/A for the fiscal year ended June 30, 2004.  The Company also has filed with the Securities and Exchange Commission Quarterly Reports on Form 10-Q for the quarters ended September 30, 2004 and December 31, 2004.

> The Company believes that it has now complied with the March 15 filing deadline set forth by the Nasdaq Listing Qualifications Panel in granting the Company's request for continued listing on the Nasdaq National Market.

> On October 27, 2004, the Company announced that the Audit Committee had commenced a detailed investigation of the Company's accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000 through 2002. The scope of the Audit Committee's investigation was later expanded to include certain transactions entered into during fiscal years 1999, 2003 and 2004. *Based upon the Audit Committee's investigation, the Company determined that certain license transactions entered into in fiscal years 1999 through 2002 were accounted for improperly, and concluded that license revenues associated with the transactions were misstated in fiscal years 1999 through 2004*.

> In addition, and based on information discovered during the Audit Committee's investigation, the Company determined *that accounting for software license sales to resellers should have been recorded on a sell-through, or consignment basis, rather than a sell-in, or upfront, basis*, resulting in the deferral of license revenues from the period in which they were originally recorded to the period in which the software licenses were sold by the resellers to end users. As a result of the foregoing, *the financial statements for the fiscal years 2000 through 2004 have been restated*.

> *The Company has also determined that accounting for tax withholdings involving transactions in Japan and an associated change in Japanese tax law required restatement, that the timing of certain reductions in software license revenues should be restated, and that equity in earnings from joint ventures and loss (gain) on sales and disposals of assets should be reclassified*. The restatement also includes the recording of previously identified errors that were previously not

recorded because in each case and in aggregate the Company believed the amount of any such error was not material to the Company's consolidated financial statements.

As a result of these restatements, total revenues for fiscal 2004 increased by $7.3 million or 2%; total revenues for fiscal year 2003 increased by $23.7 million or 7%; total revenues for fiscal year 2002 increased by $1.8 million or 1%; total revenues for fiscal year 2001 decreased $12.5 million or 4%; and total revenue for fiscal year 2000 decreased $7.0 million or 3%.

The restatement adjustments resulted in increases in net income of $6.8 million in fiscal year 2004, $21.6 million in fiscal year 2003, and $1.2 million in fiscal year 2002. Net income in fiscal years 2001 and 2000 decreased by $16.4 million and $8.7 million, respectively. Restatement adjustments for fiscal year 1999 resulted in increases to the opening balance of the accrued deficit account in fiscal year 2000 by $6.8 million. The revenue restatements did not have an affect effect on the Company's cash, cash equivalents, or short term investments.

119.    As stated in the Company's press release, on March 15, 2005, the Individual Defendants also caused AspenTech to file its Amendment No. 1, Form 10-K/A, restating its financial statements for FY:00-FY:04. The Form 10-K/A was signed by defendants Fusco, Kane, Jennings, Casey, Haroian, Kingsley, McArdle and Pehl and provided, in pertinent part, as follows:

**Restatement of Consolidated Financial Statements**

In October 2004, subsequent to the issuance of the Company's financial statements for the year ended June 30, 2004, the audit committee of the Company's Board of Directors commenced a detailed investigation of the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000 through 2002. The scope of the audit committee investigation was later expanded to include certain transactions entered into during fiscal years 1999, 2003 and 2004. ***Based upon the audit committee's investigation, the audit committee and Company management determined that certain transactions entered into in fiscal years 1999 through 2002 were accounted for improperly, and concluded that license revenue associated with the transactions was misstated in fiscal years 1999 through 2004***. Additionally, the audit committee and Company management concluded, based on information discovered during the investigation, that the accounting for software license sales to resellers should have been recorded on a sell-through or consignment basis of accounting rather than a sell-in or upfront basis of accounting, resulting in the deferral of license revenue from the period in which it was originally recorded to the period in which the software licenses were sold by the reseller to end users.

In addition, the Company determined that its previous accounting for tax withholdings involving transactions in Japan required restatement, that the timing of certain reductions in software license revenues should be restated, and that equity in earnings from joint ventures and loss (gain) on sales and disposals of assets should

be reclassified. The restatement also includes the recording of previously identified errors that were previously not recorded because in each case and in aggregate the Company believed the amount of any such error was not material to the Company's consolidated financial statements.

As a result of the foregoing, the Company has restated its financial statements as of June 30, 2003 and 2004 and for the fiscal years ended June 30, 2002, 2003 and 2004, including the corresponding interim periods for fiscal years 2003 and 2004. The restatement also affects periods prior to fiscal 2002 and these prior periods errors have been reflected in the adjustments to the fiscal year 2002 beginning accumulated deficit. The foregoing restatement adjustments did not affect the Company's reported cash, cash equivalents and short-term investments balance during these reported periods.

\* \* \*

*Software license revenue*

\* \* \*

<u>Arrangements outside of contractual terms</u>.  Through the course of the audit committee investigation, instances of unauthorized side arrangements with customers were identified. Generally, these side arrangements were executed contemporaneously with the software license transaction and provided customers with various rights that were not considered in the original revenue recognition assessment. The consideration provided to customers included terms such as (i) rights to terminate the arrangement; (ii) variable pricing; (iii) rights to unspecified future products; and (iv) commitments made by the Company to provide consideration in the future. Had these elements to the arrangements been taken into consideration or known at the time the transactions were recorded, a portion or all of the revenue would have been deferred until the contingencies had lapsed, the additional products were provided, or other consideration was provided by the Company. Accordingly, the Company has adjusted revenue on these transactions for the years ended June 30, 2002, 2003 and 2004 to properly reflect all of the transactions.

<u>Restatement to sell-through basis of revenue recognition</u>.  The Company sells certain of its products through distributors and other resellers. Previously, business arrangements with the Company's distributors and resellers were believed to require payment within a customary collection period and provide no return rights. Accordingly, revenue was recognized upon shipment, on a sell-in or upfront basis, given that management believed all other criteria of SOP No. 97-2 had been met. The Company has determined that, as sales pertained to distributors or resellers, it did not meet the criteria of SOP No. 97-2 that required the vendor's obligation to the buyer to be complete and the fees to be fixed or determinable at the time of product shipment. The Company had provided concessions to various distributors and resellers, including return rights outside the contractual terms, and in some instances facilitated the resale of the Company's software by its distributors. In addition, in some

instances, distributors and resellers were not obligated to pay for delivered software licenses until they had been sold through to an end user. Accordingly, the Company has adjusted revenue on all distributor and reseller transactions for the years ended June 30, 2002, 2003 and 2004 to reflect the sell-through or consignment basis of revenue recognition.

Revenue recognition timing adjustments and receivable write-offs.  Due to the errors discovered during the investigation, the Company undertook a comprehensive review of revenue recognition and identified timing issues related to the recording of revenue in the period in which it was earned. In addition, the Company has identified a number of receivable write-offs that were recorded as reductions in license revenue that should have been recorded as bad debt expense.

Foreign withholding taxes.  Software license and maintenance revenues earned from customers in Japan which were previously recorded net of the 10% Japanese withholding taxes are being restated for the years ended June 30, 2002, 2003 and 2004 to record the gross amount of the revenue and the related 10% income tax expense.

120.    The Individual Defendants also reported in the Form 10-K/A adjustments and/or reclassifications to the following areas: (1) revenue resulting from consulting services and maintenance services; (2) cost of services; (3) general and administrative costs; (4) gains and losses on sales and disposals of assets; and (5) equity in earnings from joint ventures.

121.    Further, the Individual Defendants caused the following to be disclosed in the Form 10-K/A as to the Company's systems of internal controls and procedures:

In February 2005, as part of its previously described accounting investigation, the audit committee made a report to our board relating to certain accounting and internal controls issues. In March 2005, in connection with its audit of the restated financial statements for the years ended June 30, 2002, 2003 and 2004 included in this Form 10-K/A, *Deloitte & Touche LLP made a report (again under the interim standards of the PCAOB) regarding certain elements of our system of internal controls to the audit committee of (1) a "material weakness" with respect to our software license revenue recognition controls and (2) a "reportable condition" with respect to our processes for recording restructuring accruals that did not constitute a material weakness*. Our management considered both of these reports in re-evaluating our disclosure controls and procedures as of June 30, 2004 in connection with the filing of this Form 10-K/A. *Our management concluded that the following factors contributed significantly to the material weakness with respect to our software license revenue recognition controls*:

(a)    need for improved and redundant procedures and cross-checks to reasonably assure the identification of arrangements including both software license and services components;

(b)    need for improved and redundant procedures and cross-checks to reasonably assure the detection and prevention of unauthorized arrangements with customers entered into contemporaneously with software license agreements;

(c)    inadequate systems to track sales by resellers of software licenses to end-users;

(d)    lack of a sufficient number of qualified finance personnel to review and provide guidance on revenue recognition for complex software license transactions; and

(e)    need for routinization of our processes to assess the creditworthiness of new or existing customers.

\* \* \*

***Based on their evaluation, our chief executive officer and chief financial officer concluded that, as a result of the material weaknesses in our internal controls over financial reporting described above, our disclosure controls and procedures were not effective as of June 30, 2004.***

122.    On March 15, 2005, the Individual Defendants also caused AspenTech to submit its Form 10-Q for 1Q:05 and 2Q:05 which not only provided quarterly results, but also reiterated the restatement results and the fact that a material weakness existed in AspenTech's disclosure and internal controls with respect to software license revenue as of December 31, 2004. The Form 10-Q was signed and certified by defendants Fusco and Kane.

123.    As a result of the Individual Defendants' actions, AspenTech's market capitalization has been damaged by over $11 billion. At the same time that the Individual Defendants were causing AspenTech to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $12.9 million of their personally held stock.

124.    AspenTech currently trades at $5.65 per share.

## ILLEGAL INSIDER SELLING

125.    While in possession of the undisclosed material adverse information concerning improper revenue recognition as well as other historically misclassified financials, the Insider

Selling Defendants sold the following shares of AspenTech stock during the financial periods which were subsequently restated:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Lawrence B. Evans | 12/14/2000 | 5,000 | $ 30.00 | $ 150,000.00 |
| | | **5,000** | | **$ 150,000.00** |
| Lisa W. Zappala | 2/6/2001 | 8,000 | $ 40.00 | $ 320,000.00 |
| | 2/16/2000 | 3,500 | $ 48.00 | $ 168,000.00 |
| | 2/16/2000 | 432 | $ 48.00 | $ 20,736.00 |
| | 2/15/2000 | 2,068 | $ 48.00 | $ 99,264.00 |
| | | **14,000** | | **$ 608,000.00** |
| David L. McQuillin | 9/1/2004 | 3,125 | $ 6.00 | $ 18,750.00 |
| | 9/1/2004 | 19,184 | $ 6.00 | $ 115,104.00 |
| | 9/1/2004 | 59,491 | $ 6.00 | $ 356,946.00 |
| | 8/25/2004 | 6,250 | $ 6.00 | $ 37,500.00 |
| | 8/25/2004 | 1,950 | $ 6.00 | $ 11,700.00 |
| | 6/1/2004 | 16,776 | $ 6.00 | $ 100,656.00 |
| | 6/1/2004 | 32,600 | $ 6.00 | $ 195,600.00 |
| | 6/1/2004 | 15,624 | $ 6.00 | $ 93,744.00 |
| | 6/1/2004 | 25,000 | $ 6.00 | $ 150,000.00 |
| | 2/1/2001 | 5,000 | $ 39.75 | $ 198,750.00 |
| | 2/8/2001 | 10,000 | $ 40.00 | $ 400,000.00 |
| | 1/31/2001 | 5,000 | $ 40.00 | $ 200,000.00 |
| | 9/12/2000 | 5,000 | $ 44.00 | $ 220,000.00 |
| | 9/15/2000 | 5,000 | $ 46.63 | $ 233,150.00 |
| | 2/16/2000 | 2,500 | $ 49.88 | $ 124,700.00 |
| | 2/16/2000 | 7,500 | $ 49.88 | $ 374,100.00 |
| | | **220,000** | | **$ 2,830,700.00** |
| Joseph F. Boston | 9/12/2002 | 25,000 | $ 3.98 | $ 99,500.00 |
| | 11/2/2000 | 97,500 | $ 40.82 | $ 3,979,950.00 |
| | 11/1/2000 | 7,500 | $ 41.00 | $ 307,500.00 |
| | 10/30/2000 | 40,000 | $ 38.03 | $ 1,521,200.00 |
| | 10/27/2000 | 75,000 | $ 40.03 | $ 3,002,250.00 |
| | 2/4/2000 | 6,000 | $ 50.00 | $ 300,000.00 |
| | | **251,000** | | **$ 9,210,400.00** |
| Stephen L. Brown | 11/4/2003 | 17,275 | $ 8.81 | $ 152,192.75 |
| | 11/4/2003 | 1,500 | $ 8.82 | $ 13,230.00 |
| | | **18,775** | | **$ 165,422.75** |
| **TOTAL:** | | **508,775** | | **$ 12,964,522.75** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

126.    Plaintiff brings this action derivatively in the right and for the benefit of AspenTech to redress injuries suffered, and to be suffered, by AspenTech as a direct result of the breaches of

63

fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. AspenTech is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127.    Plaintiff will adequately and fairly represent the interests of AspenTech in enforcing and prosecuting its rights.

128.    Plaintiff is and was an owner of the stock of AspenTech during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

129.    The Board of AspenTech at the time of the original complaint consisted of the following eight Individuals Defendants:  Evans, Casey, Fusco, Haroian, Jennings, Kingsley, McArdle and Pehl.  Plaintiff did not make any demand on that Board of AspenTech to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

(a)    As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees and directors, and attendance at management and/or Board meetings, the Director Defendants knew the adverse non-public information regarding the improper accounting.  Under proper corporate governance procedures, all of this adverse non-public information would have been shared between and among Board members, not only at Audit Committee meetings, but also at the Board meetings where all the committee meeting information was shared.  While in possession of this material adverse non-public information regarding the Company, the following member of the AspenTech Board at the time of the original Complaint was filed participated in the illegal insider selling:

i.        During the Relevant Period, Evans sold 5,000 shares of AspenTech stock for proceeds of $150,000. Evans' sales are suspicious because he never sold any stock before or after this particular sale. Further, this stock sale occurred during the restatement period and Evans would have known of such adverse non-public information through his roles as Chairman and CEO at the time. Because Evans received a personal financial benefit from the challenged insider trading transactions, he is interested and any demand upon him is futile;

(b)        Defendant Evans, as a principal founder and Chairman and CEO, effectively controlled the Board. Evans would have known of the ongoing accounting improprieties and inefficient disclosures and internal controls. By his control over the Board, however, he nevertheless caused and/or allowed the Board to ignore the Company's ongoing accounting improprieties which festered for multiple years, leading to the restatement of five years of financial statements. For these reasons, demand upon Evans as well as the Board he controlled is futile;

(c)        The Compensation Committee determines the CEO's compensation; reviews and approves, or makes recommendations to the Board with respect to, the compensation of other executive officers; and establishes AspenTech's compensation policies and practices, including incentive based compensation. The Compensation Committee also oversees the evaluation of senior executives; administers the cash and equity incentive plans and reviews and makes recommendations to the Board with respect to director compensation. At the time the original complaint was filed, the Compensation Committee was comprised of defendants Casey, Fusco and Jennings. As previously discussed, defendants Fusco and Casey served as members of the Compensation Committee in FY:04 and defendant Jennings served as a member of the Compensation Committee in FY:04, FY:03, FY:02, FY:01 and FY:00. As the members of the Compensation Committee has extensive control over the other defendants' awards, the remaining members of the Board will not institute this action against defendants Casey, Fusco and Jennings.

65

To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Haroian, Kingsley, McArdle, Pehl and Evans is futile;

(d)    At the time plaintiff filed his original complaint, the principal professional occupation of defendant Evans was his employment with AspenTech, pursuant to which he received, and continues to receive as a Senior Advisor, substantial monetary compensations and other benefits. Specifically, for FY:04, FY:03, FY:02, FY:01 and FY:00 AspenTech paid defendant Evans $325,000, $276,250, $314,844, $325,000 and $560,000 respectively, in salary, bonus and other compensation, and granted him 33,000, 41,016, 22,500, 22,000 and 45,000 options to purchase AspenTech stock, respectively. Accordingly, defendant Evans lacks independence from defendants Casey, Fusco and Jennings, defendants who are not disinterested and/or independent and who exert influence over defendant Evans' compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendant Evans incapable of impartially considering a demand to commence and vigorously prosecute this action;

(e)    According to AspenTech's Proxy Statement filed with the SEC on or about October 28, 2004, defendants Fusco, Haroian and McArdle were, during the Relevant Period, members of the Audit Committee. Specifically, defendant McArdle served as a member of the Audit Committee in FY:00, FY:01, FY:02, FY:03 and FY:04. Defendants Fusco and Haroian also served as members of the Audit Committee in FY:04. As discussed in more detail at ¶¶29-35, the Audit Committee is responsible for appointing and approving the compensation of, and assessing the independence of independent auditors. The audit committee also oversees the work of independent auditors, reviews and discusses with management and the independent auditors, the annual and quarterly financial statements and related disclosures; monitoring internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics and finally, overseeing internal audit functions. Nonetheless, the Audit Committee recommended that the Board

66

include the improper audited consolidated financial statements not just for one quarter or for one year, but in AspenTech's Annual Report on Form 10-K for FY:00, FY:01, FY:02, FY:03 and FY:04, as filed with the SEC. By such actions, defendants Fusco, Haroian and McArdle breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile as they face a substantial likelihood of liability;

        i.      As alleged herein, defendant Evans, Chairman of the Board during the

Relevant Period, would have had access to detailed information regarding AspenTech's financials and accounting procedures. As Chairman, Evans would have met with his fellow directors during the Relevant Period. Under proper corporate governance procedures, defendant Evans would have shared all adverse non-public information with each of the Board members at the Board members at the Board meetings during the Relevant Period.

        ii.      Further, defendants Fusco, Haroian and McArdle would have discussed AspenTech's financials and accounting principles during the Audit Committee meetings which occurred while they served as members of the Audit Committee. At a minimum, under proper corporate governance procedures Fusco, Haroian and McArdle would have shared all adverse non-public information including, but not limited to, any issue that would impact the financial statements, with each of the Board members at the Board meetings during the Relevant Period.

        iii.      Thus, repeatedly throughout the Relevant Period, by attending Audit Committee and Board meetings, all of the Director Defendants were aware of the adverse non-public information, nonetheless, the Audit Committee recommended and the Board agreed to issue AspenTech's Annual Report on Form 10-K for FY:00 through FY:04, as filed with the SEC, despite their knowledge that those results were false and misleading. By such actions, the Director

Defendants, and especially the Audit Committee members, for each year during the Relevant Period, breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand on them is futile;

(f)    The entire AspenTech Board and senior management participated in the wrongs complained of herein. AspenTech's directors are not disinterested or independent due to the following: defendants Casey, Evans, Fusco, Haroian, Jennings, Kingsley, McArdle and Pehl served on the AspenTech Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to AspenTech and its shareholders in that they failed to prevent and correct the improper financials. Thus, the AspenTech Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected AspenTech to millions of dollars in liability for possible violations of applicable securities laws;

(g)    The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

### (i)    *Pehl and Kingsley Are Long-Time Business Associates*:

Defendant Pehl is a director of Advent International Corporation ("Advent"), and has been since 2001. Defendant Kingsley is a managing director of Advent, and has been since 1997. Because of their long-standing and entangling business and professional relationships, neither defendant Pehl nor defendant Kingsley will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(h)    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(i)    Non-employee directors receive an annual fee of $25,000 for their services as directors.  The Chairperson of AspenTech's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee receive an annual retainer of $15,000, $7,500 and $7,500, respectively, payable in four equal quarterly installments.  AspenTech pays each director $2,000 for attendance at each Board or Committee meeting of at least one hour duration. As part of the December 2003 review of director compensation policies, the Nominating and Corporate Governance Committee reviewed what AspenTech entitles the Director Option Grant Program. When a non-employee is elected to the Board, an option to purchase 24,000 shares of AspenTech common stock is offered at fair market value, provided he/she was not, within the twelve months preceding his or her election as a director, an officer or employee of AspenTech or any of its subsidiaries.  This Director Option Grant Program vests over a period of three years beginning on the first quarter following the election date.  Beginning with the first annual meeting following a non-employee director's election to the Board and at the end of each quarter thereafter, each non-employee director receives a fully exercisable option to purchase 3,000 shares of AspenTech common stock, with an exercise price equal to fair market value.  Options granted to non-employee directors have a term of 10 years.  Given that the value of the options for non-employee Board members Casey, Fusco, Haroian, Jennings, Kingsley, McArdle and Pehl potentially run into the millions of dollars, one cannot conclude realistically that defendants Casey, Fusco, Haroian, Jennings, Kingsley, McArdle and Pehl are able to objectively and impartially consider a demand to bring litigation against those to whom they are beholden to for their current position and future position on the AspenTech Board.

(j)    The stock options granted to the above non-employee defendant directors Casey, Fusco, Haroian, Jennings,  Kingsley, McArdle and Pehl, which are both vested and unvested, are so valuable that they create a considerable financial incentive for these directors to retain their positions as directors.  As a result, plaintiff contends that it is more reasonable to assume an individual who has already received, and who expects to receive still more options of such significant value could not objectively decide whether to commence legal proceedings against his or her fellow directors.

(k)    On March 15, 2005, the Individual Defendants caused the Company to file its 1Q:05 and 2Q:05 Form 10-Q with the SEC and stated therein in part:

> On December 1, 2004, a purported derivative action was filed in the United States District Court District of Massachusetts, captioned *Caviness v. Evans, et. al*., Civil Action No. 04-12524 (D. Mass.)....  ***The Company believes that plaintiff's claims lack merit and intends to litigate the dispute vigorously***.

(l)    The Director Defendants of AspenTech, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from AspenTech's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(m)    In order to bring this suit, all of the directors of AspenTech would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(n)    The acts complained of constitute violations of the fiduciary duties owed by AspenTech's officers and directors and these acts are incapable of ratification;

(o)    Each of the Director Defendants of AspenTech authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance

70

of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(p)     Any suit by the current directors of AspenTech to remedy these wrongs would likely expose the Individual Defendants and AspenTech to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(q)     AspenTech has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AspenTech any part of the damages AspenTech suffered and will suffer thereby;

(r)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  They will not do this.  Thus, demand is futile; and

(s)     If AspenTech's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to

purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of AspenTech.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by AspenTech against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of AspenTech, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate  recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause AspenTech to sue them, since they will face a large uninsured liability.

130.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for AspenTech for any of the wrongdoing alleged by plaintiff herein.

131.    Plaintiff has not made any demand on shareholders of AspenTech to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     AspenTech is a publicly held company with approximately 42 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

72

**Against the Insider Selling Defendants for Breach of Fiduciary**
**Duties for Insider Selling and Misappropriation of Information**

132.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold AspenTech common stock on the basis of such information.

134.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AspenTech common stock.

135.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of AspenTech common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

136.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

137.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.     The Individual Defendants owed and owe AspenTech fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe AspenTech the highest obligation of good faith, fair dealing, loyalty and due care.

139.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

140.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AspenTech has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiff on behalf of AspenTech has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AspenTech, for which they are legally responsible.

145.    As a direct and proximate result of the Individual Defendants' abuse of control, AspenTech has sustained significant damages.

146.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff on behalf of AspenTech has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

74

148.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AspenTech in a manner consistent with the operations of a publicly held corporation.

150.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AspenTech has sustained significant damages in excess of hundreds of millions of dollars.

151.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

152.     Plaintiff on behalf of AspenTech has no adequate remedy at law.

### COUNT V

### Against All Defendants for Waste of Corporate Assets

153.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused AspenTech to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

155.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.     Plaintiff on behalf of AspenTech has no adequate remedy at law.

75

## COUNT VI

### Against All Defendants for Unjust Enrichment

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of AspenTech.

159.    Plaintiff, as a shareholder and representative of AspenTech, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of AspenTech has an effective remedy;

C.    Awarding to AspenTech restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

76

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: March 30, 2005


/s/ Mary T. Sullivan_____

Mary T. Sullivan, BBO # 487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street
Boston, MA  02178
Telephone: 617/742 0208
Facsimile: 617/742 2187

*Pending admission pro hac vice*
ROBBINS UMEDA & FINK, LLP
Brian J. Robbins
Jeffrey P. Fink
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone:  619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

77

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Amended Complaint has been served upon the Defendants' Counsel listed below, by first-class mail, postage prepaid, this 31st day of March, 2005.

/s/ Mary T. Sullivan

Mary T. Sullivan

**Service List**

Thomas J. Dougherty, Esq.
Justin Daniels, Esq.
Kerry Dakin, Esq.
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Nicholas Theodorou, Esq.
Kevin Currid, Esq.
Brandon White, Esq.
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

John J. Falvey, Jr., Esq.
TESTA, HURWITZ & THIBEAULT, LLP
125 High Street
Boston, Massachusetts 02110
(617) 248-7000

John A.D. Gilmore, Esq.
PIPER RUDNICK LLP
One International Place.
Boston, Massachusetts 02110
(617) 406-6000

VERIFICATION

I, Jeffrey P. Fink, hereby declare as follows:

1.     I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 30th day of March, 2005, at San Diego, California.