UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GARY CAVINESS, Derivatively on Behalf of        :
ASPEN TECHNOLOGY INC.,
                                                :
            Plaintiff,                                          Civil Action
                                                :               No. 04-12524-JLT
      v.
                                                :

LAWRENCE B. EVANS, LISA W. ZAPPALA, DAVID
L. MCQUILLIN, CHARLES F. KANE, STEPHEN M.        :
JENNINGS, JOAN C. MCCARDLE, MICHAEL PEHL,
DOUGLAS A. KINGSLEY, GARY E. HAROIAN,            :
MARK FUSCO, DONALD P. CASEY, STEPHEN L.
BROWN, JOSEPH F. BOSTON, DOUGLAS R.              :
BROWN and GRESHAM T. BREBACH,
                                                :
            Defendants,
                                                :
and

ASPEN TECHNOLOGY INC.. a Delaware corporation,  :

            Nominal Defendant.                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ASPEN TECHNOLOGY, INC.'S, CURRENT OUTSIDE -DIRECTORS' AND FORMER OUTSIDE-DIRECTORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 23.1 AND 12(b)(6)

Thomas J. Dougherty
Justin J. Daniels
Kerry Dakin
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

Dated:  April 19, 2005

Counsel for Aspen Technology, Inc.,
Current Outside-Directors and
Former Outside-Directors

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    PLAINTIFF IS REQUIRED TO ALLEGE WITH PARTICULARIZED
      FACTUAL STATEMENTS WHY HIS DEMAND ON THE BOARD IS EXCUSED . . 5

II.   PLAINTIFF FAILS TO ALLEGE WITH
      PARTICULARITY FACTS CREATING A REASONABLE
      DOUBT AS TO THE DISINTERESTEDNESS OF THE BOARD . . . . . . . . . . . . . . . . 7

      A.    Plaintiff Fails To Allege With Particularity
            Facts Establishing A Substantial Likelihood
            Of Personal Liability For Any Member Of The Board . . . . . . . . . . . . . . . . . . . . 7

            1.    Judge van Gestel Has Recently Ruled That
                  Remarkably Similar Allegations Asserted By
                  The Same Counsel Are Insufficient To Excuse Demand . . . . . . . . . . . . . 8

            2.    Plaintiff's Generalized Allegations Regarding
                  The Directors' Positions On The Board Are
                  Not Sufficiently Particularized To Excuse Demand . . . . . . . . . . . . . . . . 10

      B.    Plaintiff's Allegation That One Director Made One
            Trade Of AspenTech Stock Four Years Before The
            October 2004 Announcement Does Not Demonstrate Anything . . . . . . . . . . . . 12

      C.    Plaintiff's Allegations That The Directors Would
            Not Be Covered By Insurance In An Action By The Company
            Does Not Create a Reasonable Doubt As To Their Disinterestedness . . . . . . . . 14

III.  PLAINTIFF FAILS TO ALLEGE WITH
      PARTICULARITY FACTS CREATING A REASONABLE DOUBT
      THAT THE BOARD CAN RESPOND TO A DEMAND WITH INDEPENDENCE . . 15

      A.    Plaintiff Fails To Establish That Directors
            Casey, Fusco, and Jennings Control The Other
            Directors As Members of the Board's Compensation Committee . . . . . . . . . . . 16

i

B.    Plaintiff's Allegations That Directors Pehl and Kingsley Are
      Business Associates Does Not Establish That They Are Not Independent ..... 18

IV.    PLAINTIFF HAS FAILED TO VERIFY
       THE COMPLAINT AND TO ALLEGE THAT HE WAS
       A SHAREHOLDER AT THE TIME OF THE ALLEGED WRONGDOINGS ....... 19

Conclusion ............................................................. 20

## TABLE OF AUTHORITIES

<u>CASES</u>                                                    PAGE(S)

<u>Amalgamated Bank v. Yost</u>, No. Civ. A. 04-0972,
        2005 WL 226117 (E.D. Pa. Jan. 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Aronson v. Lewis</u>, 473 A.2d 805 (Del. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 9

<u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 16

<u>Caruana v. Saligman</u>, Civ. A. No. 11135,
        1990 WL 212304 (Del. Ch. Dec. 21, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>In re Citigroup Inc. Shareholder Litigation</u>,
        No. 19827 92003 WL 21384599 (Del. Ch. June 5, 2003) . . . . . . . . . . . . . 3, 4

<u>Decker v. Clausen</u>, Civ. A. Nos. 10,684 and 10,685,
        1989 WL 133617 (Del. Ch. Nov. 6, 1989) . . . . . . . . . . . . . . . . . . . . . 8, 12, 15

<u>Fink v. Komansky</u>, No. 03CV0388,
        2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004) . . . . . . . . . . . . . . . . . . . . 9, 10, 11

<u>Green v. Phillips</u>, Civ. A. No. 14436,
        1996 WL 342093 (Del. Ch. June 19, 1996) . . . . . . . . . . . . . . . . . . . . . . 18, 19

<u>Grobow v. Perot</u>, 539 A.2d 180 (Del. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>Guttman v. Huang</u>, 823 A.2d 492 (Del. Ch. 2003) . . . . . . . . . . . . . . . . 8, 12, 13, 14

<u>Jacobs v. Yang</u>, No. Civ. A. 206-N,
        2004 WL 1728521 (Del. Ch. Aug. 2, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90 (1991) . . . . . . . . . . . . . . . . . . . . . 2

<u>Kohls v. Duthie</u>, 765 A.2d 1274 (Del. Ch. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 19

CASES                                                                PAGE(S)

Langer v. Brown, 913 F. Supp. 260 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . 2, 17

Leung v. Schuler, No. C.A. 17089,
    2000 WL 1478538 (Del. Ch. Oct. 2, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Levine v. Smith, 591 A.2d 194 (Del. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

McCall v. Scott, 239 F.3d 808 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rales v. Blasband, 634 A.2d 927 (Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

Rattner v. Bidzos, No. Civ. A. 19700,
    2003 WL 22284323 (Del. Ch. Oct. 7, 2003) . . . . . . . . . . . . . . . . . . 10, 11, 13

In re Sagent Tech., Inc. Derivative Litig.,
    278 F. Supp. 2d. 1079 (N.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . 13, 17, 18

Seminaris v. Landa, 662 A.2d 1350 (Del. Ch. 1995) . . . . . . . . . . . . . . . . . . . . 11, 12

In re Silicon Graphics Inc. Sec. Litig.,
    183 F.3d 970 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Sonus Networks, Inc., Derivative Litig.,
    No. 04-0753-BLS (Mass. Super. Ct. Sept. 27, 2004) . . . . . . . . . . . . . . passim

Spector v. Sidhu, No. Civ. 3:03-CV-0841-H,
    2004 WL 350682 (N.D. Tex. Jan. 26, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 18

In re Stratus Computer, Inc. Sec. Litig., Civ. A. 89-2075-Z,
    1992 WL 73555 (D. Mass. Mar. 27, 1992) . . . . . . . . . . . . . . . . . . . . . . . 19, 20

White v. Panic, 783 A.2d 543 (Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

In re Xcel Energy, Inc.,
    222 F.R.D. 603 (D. Minn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

RULES                                                      PAGE(S)

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim


STATUTES                                                   PAGE(S)

Del Code Ann. tit. 8, § 220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pursuant to Fed. R. Civ. P. 23.1 and 12(b)(6), nominal defendant Aspen Technology, Inc. ("AspenTech" or the "Company") and individual defendants Stephen M. Jennings, Joan C. McArdle, Michael Pehl, Douglas A. Kingsley, Gary E. Haroian, Mark Fusco and Donald P. Casey ("Current Outside-Directors"); and Douglas R. Brown and Gresham T. Brebach ("Former Outside-Directors"), respectfully submit this memorandum of law in support of their motion to dismiss the Plaintiff's purported Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") for failure to make a demand on the board of AspenTech and for failing to allege particularized facts showing why Plaintiff's failure to make a demand should be excused.

## **Preliminary Statement**

On October 27, 2004, AspenTech announced that its Audit Committee was undertaking a review of the accounting for certain transactions that occurred in fiscal years 2000-2002. (Am. Compl. ¶ 107.) On December 1, 2004, <u>while the Audit Committee continued its review</u>, Plaintiff filed a derivative action without making a pre-suit demand on the AspenTech board of directors. (<u>See</u> Original Complaint (Docket No. 1) ("Complaint").)

At the time of the Complaint, the AspenTech board of directors was comprised of eight members, seven of whom have never been employed by the Company and five of whom joined the board in August 2003 or later; that is <u>after</u> the transactions under investigation were alleged to have occurred. (<u>Id.</u> ¶¶ 11, 15-21.)

Similarly, at the time of the Complaint, the Audit Committee was comprised of three outside-directors, two of whom joined the board <u>after</u> the transactions under investigation were alleged to have occurred. (Am. Compl. ¶ 129(e).)

1

In response to the Complaint, on January 7, 2005, the defendants filed a motion to dismiss for failure to make a demand on the board. Rather than oppose AspenTech's motion, Plaintiff's counsel requested the opportunity to amend the Complaint after the Audit Committee's investigation was concluded and any restatements announced. AspenTech conceded. (See Stipulation and Order (Feb. 1, 2005) (Docket No. 9).)

On March 31, 2005, Plaintiff filed the Amended Complaint. The Amended Complaint does not cure the plain deficiencies from Plaintiff's original Complaint. It offers the same excuses that have been repeatedly rejected by numerous courts interpreting Delaware law. In fact, each of these "excuses" was asserted by the same plaintiff's counsel in the In re Sonus Networks, Inc. Derivative Litigation and rejected by Judge van Gestel less than seven months ago as inadequate to excuse demand. (See infra pp. 8-9.)

This Court should also reject Plaintiff's generalized allegations as insufficient to excuse demand.

## **Statement of Facts**

The Amended Complaint alleges that Plaintiff is a citizen of Florida and an AspenTech shareholder, but does not allege when Plaintiff bought his AspenTech stock. (Am. Compl. ¶ 9.) AspenTech is a Delaware corporation with its headquarters in Cambridge, Massachusetts. (Id. ¶ 10.)[1]

---

[1]    AspenTech is a Delaware corporation, and therefore, Delaware law governs the substantive demand requirement. Langer v. Brown, 913 F. Supp. 260, 265 (S.D.N.Y. 1996) (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991)).

The Amended Complaint alleges that, as of December 1, 2004 (the date of filing the Complaint), there were eight directors of AspenTech: Lawrence B. Evans, Donald P. Casey, Mark Fusco, Gary E. Haroian, Stephen M. Jennings, Douglas A. Kingsley, Joan C. McArdle, and Michael Pehl (the "Directors"). (Id. ¶ 129.) Seven of the eight Directors have never been employed by the Company. (Id. ¶¶ 11, 15-21.) Importantly, the Complaint alleges that Messrs. Pehl and Kingsley did not become directors until August 2003 (id. ¶¶ 17-18), Messrs. Haroian and Fusco did not become directors until December 2003 (id. ¶¶ 19-20) and Mr. Casey did not become a director until April 2004 (id. ¶ 21).

On October 27, 2004, AspenTech announced that its Audit Committee had undertaken a detailed review of the accounting for certain software license and service agreement transactions entered into during fiscal years 2000-2002. (Id. ¶ 107.)

On November 24, 2004, AspenTech announced that the Audit Committee had determined that the Company had improperly accounted for five software license transactions entered into during fiscal years 2000 and 2001. (Id. ¶ 113.) In addition, the Company announced that the investigation was ongoing and that the committee had decided to evaluate certain agreements entered into in fiscal years 2003 and 2004. (Id.)

On December 1, 2004, Plaintiff filed the original Complaint in this derivative action, without making a demand on the board of directors. In fact, Plaintiff had absolutely no contact with the board, never requested information and followed none of the procedures set forth under Delaware law. See Del. Code Ann. tit. 8, § 220 (Delaware's books and records law).[2]

---

[2]    For years, the Delaware courts have "been urging would-be derivative plaintiffs to use the 'tools at hand' before filing complaints. The purpose of such a presuit investigation is to enable those persons to draw complaints that satisfy Rule 23.1's requirement that facts be alleged 'with particularity' justifying demand excusal. Some plaintiffs have heeded this call. Others have not." In re Citigroup Inc. S'holders
(continued...)

AspenTech filed its motion to dismiss on January 7, 2005 and, in response to the motion, Plaintiff's counsel requested the opportunity to amend.

On January 31, 2005, AspenTech issued an "Update to Audit Committee Review," stating that the Audit Committee had substantially completed its transactional analysis and, as a result of the review, had "identified sixteen transactions entered into during fiscal years 2000, 2001 and 2002 that were accounted for improperly." (Id. ¶ 117.)  In addition, the press release stated that the Audit Committee had determined, "that the accounting for software license sales to resellers beginning in the fiscal year ended June 30, 2001 should have been recorded on a sell-through or consignment basis of accounting rather than a sell-in or upfront basis of account-ing." (Id.)

On March 15, 2005, AspenTech announced that, as a result of the Audit Committee investigation, "the Company determined that certain license transactions entered into in fiscal years 1999 though 2002 were accounted for improperly," and that "accounting for software license sales to resellers should have been recorded on a sell-through, or consignment basis, rather than a sell-in upfront basis." The Company announced that it "has restated its financials for each of the fiscal years ended June 30, 2000 though June 30, 2004." (Id. ¶ 118.)

On March 31, 2005, Plaintiff filed his purported Amended Complaint. The Amended Complaint alleges that AspenTech issued press releases and public filings that failed to disclose that the "Company had improperly and prematurely recognized revenue for certain software license and service agreement transactions" entered into during fiscal years 2000

---

[2](...continued)
Litig., No. 19827, 2003 WL 21384599, *1 (Del. Ch. June 5, 2003).  Plaintiff's Amended Complaint "clearly falls in the second category."  Id. (dismissing shareholder derivative suit for failing to plead particularized facts which would excuse demand where plaintiff failed to use Delaware's books and records provision before filing derivative complaint).

through 2004, that "the Company lacked adequate internal controls," and that as a result, "the values of the Company's revenues, earnings, assets and/or liabilities for FY:00 through FY:04 were improperly accounted for and would have to be restated." (Id. ¶ 6.) Although required, Plaintiff did not verify the Complaint or Amended Complaint. (See Compl and Am. Compl. at unnumbered last page.)

## Argument

## I.     PLAINTIFF IS REQUIRED TO ALLEGE WITH PARTICULARIZED FACTUAL STATEMENTS WHY HIS DEMAND ON THE BOARD IS EXCUSED

A "cardinal precept" of Delaware corporate law is that "directors, rather than shareholders, manage the business and affairs of the corporation." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 (Del. 2000). As a result, a shareholder is not permitted to bring a derivative suit to enforce the rights of a corporation unless the shareholder demonstrates either that the board wrongfully refused to bring suit or that a demand on the board would have been futile and is therefore excused. White v. Panic, 783 A.2d 543, 550 (Del. 2001) (dismissing derivative complaint with prejudice where plaintiff failed to allege with particularity why demand was futile).

Where, as in this case, the shareholder fails to make a demand on the board, Fed. R. Civ. P. 23.1 requires that the complaint allege "with particularity" the reasons for plaintiff's failure to demand action. To satisfy this requirement under Delaware law, the shareholder must allege "sufficient particularized facts to support an inference that demand is excused because the board is 'incapable of exercising its power and authority to pursue the derivative claims directly.'" White, 783 A.2d at 551 (quoting Levine v. Smith, 591 A.2d 194, 200 (Del. 1991) (emphasis in original)).

In cases like this, where the plaintiff does not challenge a particular business decision of the board (such as a compensation package or sale of assets), the court must answer two questions: "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its <u>independent</u> <u>and</u> <u>disinterested</u> business judgment in responding to a demand." <u>Rales v. Blasband</u>, 634 A.2d 927, 934 (Del. 1993) (emphasis added).

Under Delaware law there is a presumption that directors are independent and that their acts have been taken in good faith and in the best interests of the corporation. <u>Aronson</u>, 473 A.2d at 815-16. "That presumption is heightened where, as here, the majority of the directors making the decision are independent or outside directors." <u>Leung v. Schuler</u>, No. C.A. 17089, 2000 WL 1478538, *6 (Del. Ch. Oct. 2, 2000) (granting motion to dismiss amended complaint pursuant to Rules 12(b)(6) and 23.1).

To demonstrate that the directors are not disinterested, Plaintiff "must plead particularized facts demonstrating either a financial interest or entrenchment on part of the [majority of the current AspenTech] directors." <u>Grobow v. Perot</u>, 539 A.2d 180, 188 (Del. 1988), <u>overruled in part on other grounds by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244, 253 (Del. 2000) (holding that plaintiff failed to allege particularized facts demonstrating that the majority of the board was not independent or disinterested). To challenge director independence, plaintiff must "allege with particularity that [a majority of the AspenTech] directors were dominated or otherwise controlled by an individual or entity interested in the transaction." <u>Id.</u> at 189. In other words, the question is, were a <u>majority</u> of the current AspenTech directors "incapable, due to personal interest or domination and control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims that are raised by [the] [P]laintiff[ ] or otherwise remedy the

6

alleged injury?" <u>Brehm</u>, 746 A.2d at 257-58 (holding that plaintiff failed to allege particularized

facts showing that a majority of the board was interested or lacked independence).

## II.    PLAINTIFF FAILS TO ALLEGE WITH PARTICULARITY FACTS CREATING A REASONABLE <u>DOUBT AS TO THE DISINTERESTEDNESS OF THE BOARD</u>

    Plaintiff attempts to challenge the disinterestedness of the board by alleging (1)

that all of the Directors participated in and/or approved the alleged wrongdoing; (2) that Mr.

Evans traded AspenTech stock almost four years before the October 2004 announcement; and (3)

that the directors and officers liability insurance would not cover the director defendants in a suit

against them by the Company.  Each of these arguments has been soundly and repeatedly rejected

under Delaware law.

### A.    Plaintiff Fails To Allege With Particularity Facts Establishing A Substantial Likelihood <u>Of Personal Liability For Any Member Of The Board</u>

    Five of the eight Directors did not join the board until August 2003 or later; that

is, after the transactions that lead to the restatement were alleged to have occurred.  Yet, Plaintiff

alleges generically that demand is excused because the Directors "participated in the wrongs

complained of herein."  (Am. Compl. ¶ 129(f); <u>see also id.</u> ¶¶ 129(h), (l) and (o).)  Plaintiff does

not allege that <u>any</u> of the directors had any specific knowledge of the alleged wrongdoing, but

alleges that <u>solely as a result of their positions on the board</u> they "knew the adverse non-public

information regarding the improper accounting" and therefore must be liable.  (<u>Id.</u> ¶ 129(a).)

    To win on a liability theory of demand futility, plaintiff must demonstrate for a

majority of the Directors that "a substantial likelihood of director liability . . . exists."  <u>Aronson</u>,

473 A.2d at 815, 817 (holding that allegations that directors had approved the challenged

transaction and would therefore be liable if plaintiff prevailed failed to demonstrate that demand

was excused). As a result, the inquiry becomes whether Plaintiff has "pled facts that show that [a majority of the current AspenTech directors] face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand." Guttman v. Huang, 823 A.2d 492, 503 (Del. Ch. 2003). An unsupported allegation that the Directors participated in or approved of the alleged wrongs is insufficient to excuse demand. Decker v. Clausen, Civ. A. Nos. 10,684 and 10,685, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989) (holding that demand was not excused where complaint alleged that the "directors participated in and/or approved the alleged wrongs.").

        **1.**    **Judge van Gestel Has Recently Ruled That**
                   **Remarkably Similar Allegations Asserted By**
                   **The Same Counsel Are Insufficient To Excuse Demand**

        Judge van Gestel has recently dismissed with prejudice a derivative action filed by the same counsel where, as in this case, the complaint failed to allege with particularity a substantial likelihood of liability for a majority of the current directors. In re Sonus Networks, Inc. Derivative Litig., No. 04-0753 BLS (Mass. Super. Ct. Sept. 27, 2004) (referred to herein as "Sonus" and attached hereto at Tab A). As in this case, plaintiff in Sonus alleged that the company had issued false press releases and filed false reports regarding the company's financial statements and that the members of the board's audit committee approved the reports. Id. at 2. And, as in this case, plaintiff attempted to excuse demand with general allegations that, as a result of their position on the board, each of the directors "knew the adverse non-public informa- tion regarding the improper accounting," that the directors on the audit committee were responsi- ble "for reviewing the activities of Sonus' internal auditors and independent accountants," and therefore that "[t]he entire Sonus Board of Directors and senior management participated in the

wrongs complained of herein." (See Complaint in <u>Sonus</u> at ¶ 63(a), (d) and (e) (attached hereto at Tab B).)

The court found that the complaint had failed to demonstrate that demand was excused because it contained only "generalized allegations reflecting poor supervision over financial statements," and "no particularized allegations as to any specific act by any particular board member individually or by the board as a whole." <u>Id.</u> at 6.  As to all of the directors, the court found that "there is an absence of specific or particularized allegations regarding how they would have been put on notice of any accounting problems or improprieties." <u>Id.</u> at 8.

Judge van Gestel's decision is consistent with other recent decisions interpreting Delaware law.  For example, in <u>In re Xcel Energy, Inc.</u>, 222 F.R.D. 603 (D. Minn. 2004), plaintiff alleged that certain public statements and SEC filings were false and misleading, identified "certain defendants as members of the finance committee and others as members of the audit committee" and alleged that "those defendants had a heightened duty to monitor the corporation's activities" and that the director defendants "knew or should have known" about the alleged wrongdoing. <u>Id.</u> at 607.  The court concluded that these "broad, generalized and conditional statements . . . do not constitute facts pleaded with particularity." <u>Id.</u>  As a result, the court dismissed the action for failure to make a demand. <u>Id.</u> at 608.[3]

Similarly, in <u>Fink v. Komansky</u>, No. 03CV0388, 2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004), plaintiff alleged that director defendants had knowledge of "'adverse non-public information about Merrill Lynch and its relationship with Enron [Corporation],' obtained by accessing 'corporate documents, conversations and connections with other corporate officers and

---

[3]     Although decided under Minnesota law, the court cited Delaware law as authority. <u>See</u> <u>In re Xcel Energy, Inc.</u>, 222 F.R.D. at 606 (citing <u>Aronson v. Lewis</u>, 473 A.2d 805 (Del. 1984) and <u>Rales v. Blasband</u>, 634 A.2d 927 (Del. 1993)).

employees[,]' by attending Board or management meetings, and serving on the Board's standing committees." Id. at *1. The court concluded that plaintiff had failed to "allege with particularity precisely defendants' role in [the alleged] illegal acts. The Amended Complaint does not lay out any specific facts demonstrating that the defendants were aware of the unlawful nature of Enron's conduct that would signal to the Board that Merrill Lynch should not do business with Enron." Id. at *4 (emphasis in the original). The court dismissed the action for failure to make a demand on the board. Id. at *8. See also Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *10 n.53, *11 (Del. Ch. Oct. 7, 2003) (holding that generalized allegations regarding defendants "positions within the company" was not sufficient to demonstrate knowledge of the alleged accounting irregularities).

### 2.    Plaintiff's Generalized Allegations Regarding The Directors' Positions On The Board Are Not Sufficiently Particularized To Excuse Demand

Like Sonus, Xcel, Fink, and Rattner, among others, Plaintiff fails to provide any particularized allegations as to how any individual defendant was aware of the alleged misconduct. Rather, for each defendant, the Complaint repeats the same conclusory allegations, stating that "[b]ecause of [his or her] position, [he or she] knew the adverse non-public information about the business of AspenTech . . . via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to [him or her] in connection therewith." (Am. Compl. ¶¶ 11-25.)[4]

---

[4]    This generalized allegation is almost word for word the same allegation made by plaintiff in Rattner. Rattner, 2003 WL 22284323, at *10 n.53. The court in Rattner, concluded that such allegations "fail to allege with particularity what information the directors knew and how they acquired such knowledge." Id. As a result, Plaintiff's allegations do not excuse demand.

In response to AspenTech's original motion to dismiss, Plaintiff has added allegations regarding the members of the Audit Committee. Plaintiff does not provide any particularized allegations regarding the knowledge of any member of the Audit Committee regarding any of the transactions that occurred during fiscal years 1999-2002. Rather, Plaintiff concludes that -- solely due to their position on the Audit Committee -- the Committee members "knew or should had known that the Company's financial statements were false and thereby permitted or condoned the unlawful practices described herein" (id. ¶ 34) and that, "as members of the Audit Committee and AspenTech Board, the above named directors received briefings, reports, and internal communications concerning the unlawful practices described herein" (id. ¶ 35).

Sonus, Xcel, Fink and Rattner establish that such generalized allegations of knowledge based only on a director's position are insufficient to excuse demand. There are no particularized allegations in the Amended Complaint as to what was discussed at any board meeting or audit meeting or what was the content of the alleged "briefings, reports, and internal communications." Importantly, there is no allegation that any of the Directors attended any meeting or read any report that discussed any of the transactions that occurred during fiscal years 1999-2002. As alleged, five of the eight Directors did not join the board until 2003 or later.

Plaintiff's allegations regarding defendants' participation in the alleged wrongdoing based solely on their positions on the board do not excuse demand. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 990 (9th Cir. 1999) (holding that plaintiff's "general allegation that the Board participated in the fraudulent scheme" was "insufficient" to excuse demand); Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995) (holding that allegations that directors

signed misleading 10-K and misleading registration statement did not establish that directors "faced a substantial likelihood of liability").[5]

**B.    Plaintiff's Allegation That One Director Made One Trade Of AspenTech Stock Four Years Before The October 2004 Announcement Does Not Demonstrate Anything**

Plaintiff alleges that director Evans is "interested" because in December 2000 -- almost four years before the October 2004 Announcement -- he sold stock "for proceeds of $150,000." (Am. Compl. ¶ 129(a)(i).)[6]  In Sonus, Plaintiff's counsel asserted substantially similar allegations and Judge van Gestel concluded they were insufficient to excuse demand. Sonus at 7 (concluding that demand not excused because "complaints contain no particularized allegations of facts that would demonstrate any impropriety with [director's] stock sale.")

Judge van Gestel's decision is consistent with Delaware law which has rejected the argument that a director is interested "whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." Guttman, 823 A.2d at 502.  Rather, plaintiff must allege facts with particularity that demonstrate that the director faces "a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand." Id. at 503.

---

[5]    Plaintiff's allegation that demand is excused because "all of the directors of AspenTech would be forced to sue themselves" (Am. Compl. ¶ 129(m)) has been consistently rejected by the Delaware courts. See, e.g., Decker v. Clausen, Civ. A. Nos. 10,684 and 10,685, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989).  In addition, Plaintiff's allegations that a suit by the Directors would "likely expose the Individual Defendants and AspenTech to further violations of the securities laws" (Am. Compl. ¶ 129(p)) and would "expose their own misconduct" (id. ¶ 129(r)) are only variations on the "discredited refrain - you can't expect directors to sue themselves." Seminaris, 662 A.2d at 1355 (internal quotations omitted).

[6]    Plaintiff's allegations that certain officers and persons who do not sit on the current board of directors sold shares of AspenTech stock (see Am. Compl. ¶ 125) are irrelevant to the question of whether demand is excused "for an obvious reason: they are not on the board." Guttman, 823 A.2d at 503 n.22.

12

For example, in <u>Guttman</u>, plaintiff brought a derivative action alleging that directors had failed to prevent accounting irregularities that caused the company to restate its financials and had illegally traded company stock with knowledge of the accounting irregularities. <u>Id.</u> at 493. However, "[e]ntirely absent from the complaint [were] well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities." <u>Id.</u> at 503. As a result, the court concluded that plaintiff could not demonstrate that demand was excused based on allegations of insider trading. <u>Id.</u> at 505. <u>See also</u> <u>In re Sagent Tech. Inc. Derivative Litig.</u>, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) (holding that plaintiff failed to raise a reasonable doubt that director faced substantial likelihood of liability for insider trading where "complaint contains no allegations that [director] was in possession of any particular material adverse information when he sold his [company] stock"); <u>Rattner</u>, 2003 WL 22284323, at *11, *12 (holding that demand could not be excused based on allegations of insider trading where the complaint "alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities.").

As discussed above in Section II.A., Plaintiff in this case has failed to allege with particularity any facts which would demonstrate that Mr. Evans (or any other director) had "any idea about the questionable accounting practices." <u>Guttman</u>, 823 A.2d at 504. In response to AspenTech's original motion to dismiss, Plaintiff has added an allegation that Mr. Evans "would have known of such adverse non-public information through his roles as Chairman and CEO." (Am. Compl. ¶ 129(a)(i).) Again, this allegation fails to particularize what knowledge Mr. Evans had about any specific non-public information and therefore fails to excuse demand.

13

In addition, the Complaint does not "contain particularized facts providing an inference of insider trading." Guttman, 823 A.2d at 503. There is nothing suspicious about the amount of the trade. Although the Complaint alleges that Mr. Evans traded 5,000 shares of stock, it fails to allege whether this was a substantial portion of Mr. Evans' holdings or whether Mr. Evans continues to hold AspenTech stock. The allegation that Mr. Evans has received over 160,000 options to purchase AspenTech stock only suggests that 5,000 shares was not a substantial share of Mr. Evans' holdings.

There is also nothing suspicious about the timing of the trade. Mr. Evans' alleged trade in December 2000 was almost four years before the October 2004 announcement. In response to AspenTech's original motion, Plaintiff added the conclusory allegation that "Evans' sales are suspicious because he never sold any stock before or after this particular sale." (Am. Compl. ¶ 129(a)(i).) This allegation fails to particularize what non-public information Mr. Evans had in December 2000 that caused him to make the trade and, most importantly, why he did not use that non-public information to trade in the period prior to the October 2004 announcement. As a result, Plaintiff has failed to demonstrate that Mr. Evans is not disinterested. See McCall v. Scott, 239 F.3d 808, 825 (6th Cir. 2001) (holding that even where there were alleged "red flags" warning of the company's accounting irregularities -- which there were not in this case -- plaintiff failed to connect the timing of the trades to those warnings, and therefore demand could not be excused).

**C.    Plaintiff's Allegations That The Directors Would Not Be Covered By Insurance In An Action By The Company Does Not Create a Reasonable Doubt As To Their Disinterestedness**

Finally, Plaintiff contends that all of the director defendants are interested because "the directors' and officers' liability insurance policies covering the defendants in this case

14

contain provisions that eliminate coverage for any action brought directly by AspenTech against these defendants." (Am. Compl. ¶ 129(s).) Again, Plaintiff's counsel asserted this same allegation in <u>Sonus</u> and Judge van Gestel concluded that it failed to excuse demand. <u>Sonus</u> at 9 (holding that "conclusory allegations about . . . insurance coverage are insufficient to excuse the demand requirement).

Judge van Gestel's decision is consistent with Delaware law. For example, in <u>Caruana v. Saligman</u>, Civ. A. No. 11135, 1990 WL 212304, at *3 (Del. Ch. Dec. 21, 1990), plaintiff in a derivative action sought to show that demand was excused on all of the directors because the company's liability insurance would not cover "an action brought by the company against its own directors." The court concluded that plaintiff's allegations did not excuse demand on the directors. <u>Id</u>. <u>See also</u> <u>Decker v. Clausen</u>, Civ. A. Nos. 10,684 and 10,685, 1989 WL 133617, at *2 (Del. Ch. Nov. 6, 1989) (rejecting contention that demand was excused because the company's "liability insurance would not cover an action brought by the company against its own directors" as merely "variations on the 'directors suing themselves' and 'participating in the wrongs' refrain.").

Just as in <u>Sonus</u>, <u>Caruana</u> and <u>Decker</u>, this Court should reject plaintiff's un-founded argument that a lack of liability insurance excuses demand on the board of directors.

## III. PLAINTIFF FAILS TO ALLEGE WITH PARTICULARITY FACTS CREATING A REASONABLE DOUBT THAT THE BOARD CAN RESPOND TO A DEMAND WITH INDEPENDENCE

Plaintiff contends that the Directors lack independence because (1) they are "controlled" by the members of the compensation committee and (2) Messrs. Pehl and Kingsley are business associates. Neither of these contentions has merit.

15

A.    **Plaintiff Fails To Establish That Directors
        Casey, Fusco, and Jennings Control The Other
        Directors As Members of the Board's Compensation Committee**

Plaintiff contends that Messrs. Casey, Fusco and Jennings control the other

Directors as a result of their position on the Compensation Committee, and therefore, demand on

Messrs. Evans, Haroian, Kingsley, McArdle and Pehl is excused.  (Am. Compl. ¶ 129(c).)  In

Sonus, Plaintiff's counsel asserted substantially similar allegations and Judge van Gestel

concluded that demand was not excused.  Sonus at 8.

Judge van Gestel's decision is consistent with Delaware law for two independent

reasons.  First, Plaintiff has failed to demonstrate that Messrs. Casey, Fusco or Jennings are

"interested" directors.  Messrs. Casey, Fusco and Jennings' alleged control of the remaining

Directors is immaterial to the question of whether the remaining Directors are independent unless

Plaintiff can demonstrate that Messrs. Casey, Fusco and Jennings are interested.  For example, in

Brehm v. Eisner, 746 A.2d 244, 257 (Del. 2000), plaintiffs in a derivative lawsuit alleged that a

majority of the directors were beholden to the CEO; however, the plaintiffs failed to demonstrate

that the CEO was interested in the challenged transaction.  Id. at 258.  As a result, the court found

that the complaint failed to demonstrate that a majority of the board lacked independence.  Id.

Similarly, in this case, Plaintiff fails to include any particularized allegations that

Messrs. Casey, Fusco or Jennings (or any other director) are "interested" in any of the transac-

tions for which the accounting was restated.  See Section II.A.  As a result, demand is not

excused on the remaining Directors.  See Sonus at 8 (holding that an allegation that defendant

directors held a position on the board's compensation committee, and therefore purportedly

controlled the remaining directors was not sufficient to excuse demand on the remaining

directors without particularized allegations demonstrating that the members of the compensation committee were "interested").

Second, Plaintiff has failed to demonstrate that Messrs. Casey, Fusco and Jennings "control" the remaining Directors. Plaintiff alleges that the directors receive compensation in the form of annual fees, attendance fees and option grants. (Am. Compl. ¶ 129(i).) It is well established, however, that the mere "receipt of directors' fees does not constitute a disqualifying interest for the purposes of the demand requirement." Langner v. Brown, 913    F. Supp. 260, 266 (S.D.N.Y. 1996) (holding that plaintiff failed to demonstrate that demand was excused based on defendants' receipt of directors' fees); see also Amalgamated Bank v. Yost, N. Civ. A. 04-0972, 2005 WL 226117, at *9 (E.D. Pa. Jan. 31, 2005) (holding that "$50,000 per year stipend, along with stock options and fees for attending meetings" did not excuse demand). And, there are no allegations in the complaint demonstrating that the receipt of this compensation has made the directors "beholden" to Messrs. Casey, Fusco and Jennings. See Langner, 913 F. Supp. at 266. For example, there is no allegation that any of the director defendants relied on their director compensation for their livelihood or even for a substantial portion of their income. As a result, plaintiff has failed to demonstrate that Messrs. Casey, Fusco and Jennings control the remaining director defendants.[7] See id.; see also In re Sagent Tech., Inc., 278 F. Supp. 2d. 1079,

---

[7]    In a similar vein, Plaintiff also alleges, that all outside-directors are interested as a result of their compensation for service on the board, and therefore demand is excused on Messrs. Casey, Fusco, Haroian, Jennings, Kingsley, McArdle and Pehl. (Am. Compl. ¶ 129(i)-(j).) Again, this contention is contrary to Delaware law and would be an exception that would swallow the rule. See Langner, 913 F. Supp. at 266 and Amalgamated Bank, 2005 WL 226117, at *9.

In response to AspenTech's original motion, Plaintiff has added an allegation that Mr. Evans is dependent on the members of the compensation committee due to their "influence" over his compensation. (Am. Compl. ¶ 129(d).) Delaware law is clear, however, that a bare allegation that a director is employed by the company or is a paid consultant for the company does not excuse demand. In re Sagent Tech., Inc., 278 F. Supp. 2d. at 1089 (holding that plaintiffs failed to raise a reasonable doubt as to

(continued...)

17

1089 (N.D. Cal. 2003) (holding that plaintiffs failed to raise a reasonable doubt as to directors' independence based on compensation received as employee and consultant of company).[8]

**B.**    **Plaintiff's Allegations That Directors Pehl and Kingsley Are Business Associates Does Not Establish That They Are Not Independent**

Plaintiff alleges that demand on Messrs. Pehl and Kingsley is excused because Pehl is a director of Advent International Corporation ("Advent") and Kingsley is a managing director of Advent. (Am. Compl. ¶ 129(g)(i).)  Again, Judge van Gestel concluded that a substantially similar allegation asserted by Plaintiff's counsel in Sonus failed to excuse demand. Sonus at 8 (holding that directors "are not . . . interested or lacking in independence merely because they share outside professional associations or relationships.").

Judge van Gestel's decision is consistent with Delaware law which provides that general allegations of business and personal ties are not sufficient to excuse demand. See Green v. Phillips, Civ. A. No. 14436, 1996 WL 342093 (Del. Ch. June 19, 1996) (rejecting plaintiff's

---

[7](...continued)
directors' independence based on compensation directors received as employee and consultant of company).

[8]     In response to AspenTech's original motion, Plaintiff has added the allegation that "[d]efendant Evans, as Chairman and CEO, effectively controlled the Board." (Am. Compl. ¶ 129(b).)  Such conclusory allegations of control do not excuse demand under Delaware law. Jacobs v. Yang, No. Civ. A. 206-N, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) (holding that allegations that directors would not bring suit against two founders of Yahoo! did not excuse demand even though the company's SEC filings stated that the company was "substantially dependent" on the two founders); Spector v. Sidhu, No. Civ. 3:03-CV-0841-H, 2004 WL 350682 (N.D. Tex. Jan. 26, 2004) (holding that allegation that insider defendants controlled the board through "entangling alliances and interlocking business relationships" failed to excuse demand). There are no allegations that Mr. Evans controlled the other Directors by means of stock ownership in AspenTech, through the board nominating process or by any personal or business connections that would make them beholden to Mr. Evans.  In addition, any allegation of control by Mr. Evans is directly contradicted by Plaintiff's subsequent allegation that Evans "lacks independence" from the members of the compensation committee due their alleged "influence" over Mr. Evans' compensation. (Am. Compl. ¶ 129(d).)

argument that director lacked independence due to "longstanding personal and business ties" to the beneficiary of the challenged transaction).

For example, in Kohls v. Duthie, 765 A.2d 1274, 1284 (Del. Ch. 2000), plaintiff challenged the independence of a Special Committee reviewing a strategic transaction by arguing that one director on the Special Committee was beholden to the company's CEO because the CEO had once provided the director a summer job and the company had invested $5 million in a fund where the director was the COO. The court rejected plaintiff's contention and held that there was nothing about the director's relationship with the CEO "to suggest that he could not exercise independent judgment." Id.

In this case, Plaintiff has alleged only the bare fact that Messrs. Pehl and Kingsley hold positions at the same other, independent company, but has alleged no particularized facts from which to infer that there is anything about Pehl's and Kingsley's positions at Advent that would impede their independence. Further, Plaintiff has not alleged any particularized facts demonstrating that either one of these directors is "interested" in the restated transactions, which occurred before they became directors. As a result, the fact that Messrs. Pehl and Kingsley hold positions at Advent does not excuse demand. See id.; see also Green, 1996 WL 342093 at *5.

## IV. PLAINTIFF HAS FAILED TO VERIFY THE COMPLAINT AND TO ALLEGE THAT HE WAS A SHAREHOLDER AT THE TIME OF THE ALLEGED WRONGDOINGS

Fed. R. Civ. P. 23.1 requires that the complaint in a derivative action "shall be verified." The Amended Complaint is purportedly verified by the shareholder's attorney, "because plaintiff is absent from the County of San Diego where [plaintiff's attorney] maintain[s] [his] office." (Am. Compl. at last unnumbered page.) Because Plaintiff himself has failed to verify the complaint, this derivative action must be dismissed. Fed. R. Civ. P. 23.1; see also In re

Stratus Computer, Inc. Sec. Litig., Civ. A. 89-2075-Z, 1992 WL 73555, *10 (D. Mass. Mar. 27, 1992) (dismissing derivative case where plaintiff did not verify the complaint).

Fed. R. Civ. P. 23.1 also requires that the Plaintiff allege that he "was a share-holder or member at the time of the transaction of which the plaintiff complains." In this case, Plaintiff only alleges that he "is, and was at times relevant hereto, an owner and holder of AspenTech common stock." (Am. Compl. ¶ 9.) As a result, Plaintiff has failed to comply with Fed. R. Civ. P. 23.1 and this derivative action must be dismissed on this ground as well.

## Conclusion

For the foregoing reasons, this Amended Complaint should be dismissed with prejudice in its entirety.

Dated: April 19, 2005
Boston, Massachusetts

Respectfully submitted,

Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO #656118)
Kerry Dakin (BBO #640826)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

Counsel for Aspen Technology, Inc.,
Current Outside-Directors and
Former Outside-Directors

### Certificate Of Service

I, Kerry Dakin, hereby certify that on April 19, 2005, I caused a true copy of the foregoing Aspen Technology, Inc.'s, Current Outside-Directors' And Former Outside-Directors' Memorandum of Law In Support Of Their Motion To Dismiss The Amended Complaint Pursuant To Fed. R. Civ. P. 23.1 And 12(b)(6) to be served upon counsel of record for each party as indicated on the service list attached hereto.

Dated: April 19, 2005

Kerry Dakin

20

# SERVICE LIST

**BY HAND**
Mary T. Sullivan, Esq.
Segal Roitman & Coleman
11 Beacon Street, Suite 500
Boston, MA  02108

**Counsel for Plaintiff**

**BY HAND**
John J. Falvey, Jr., Esq.
Christopher C. Nee, Esq.
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA  02109

**Counsel for Lisa Zappala**

**BY FEDEX**
Brian J. Robbins, Esq,
Jeffrey P. Fink, Esq.
Robbins Umeda & Fink LLP
1010 Second Avenue, Suite 2360
San Diego, CA  92101

**Counsel for Plaintiff**

**BY HAND**
John A.D. Gilmore, Esq.
Piper Rudnick LLP
One International Place, 21st Fl.
Boston, MA  02110

**Counsel for David McQuillin**

**BY HAND**
Nicholas Theodorou, Esq.
Brandon White, Esq.
Kevin Currid, Esq.
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2600

**Counsel for Lawrence Evans**

**19**

<u>N.B.  FOR CLERK'S USE ONLY</u>    9/27/04
<u>JUDGMENT ENTERED ON DOCKET</u>
PURSUANT TO MASS.R.CIV.P.58(a) AND NOTICE SENT
TO PARTIES PURSUANT TO MASS.R.CIV.P.77(d)
AS FOLLOWS:

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COMMONWEALTH   OF   MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. __04-0753 BLS__
(van Gestel, J )

<u>IN RE SONUS NETWORKS, INC.,</u>        PLAINTIFF(S)
    <u>DERIVATIVE LITIGATION</u>

            v.

                    DEFENDANT(S)

<u>JUDGMENT ON MOTION TO DISMISS</u>
<u>(PURSUANT TO MASS.CIV.P.12(b)</u> (6) )

THIS ACTION CAME ON TO BE HEARD ON THE MOTION OF DEFENDANT(S)_____

_____ TO DISMISS THE ACTION, AND THE

COURT,_____ van Gestel,_____ J., PRESIDING, HAVING ALLOWED THE

SAID MOTION, IT IS HEREBY ORDERED AND ADJUDGED THAT THE ACTION BE DISMISSED,
AND EACH PARTY TO BEAR HIS OR ITS OWN COSTS.
~~AND THAT DEFENDANT RECOVER COSTS~~

*notice sent to all parties*

DATED AT BOSTON, MASSACHUSETTS, THIS 27th DAY OF SEPTEMBER        2004

FORM OF JUDGMENT APPROVED:

MICHAEL JOSEPH DONOVAN,
CLERK/MAGISTRATE

By: _____
              ASSISTANT CLERK

_____
JUSTICE OF THE SUPERIOR COURT DEPARTMENT

Form Civ.P.46 (2nd Rev.)  6-85   500

# NOTIFY

**18**

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
LEAD CIVIL ACTION
NO. 04-0753 BLS
(Judge van Gestel)

Notice sent
toall parties
9/27/2004

IN RE SONUS NETWORKS, INC.
DERIVATIVE LITIGATION[1]

(sc)

## MEMORANDUM AND ORDER
## ON MOTIONS TO DISMISS

This matter is before the Court on the defendants' motions pursuant to Mass. R. Civ. P.

Rule 12(b)(6) and Rule 23.1 to dismiss this consolidated action. The grounds for the motions

are, among others, that the now-consolidated complaints do not comply with Rule 23.1 because

the plaintiffs failed to make a pre-suit demand upon the board of directors and because the

plaintiffs have failed to allege with particularity sufficient grounds to excuse their failure to make

such demand. Additionally, the defendants move for dismissal on grounds that the complaints

fail to state a claim, and because any claims for damages are premature.

## BACKGROUND

Sonus Networks, Inc. ("Sonus") is a Delaware corporation, said to be headquartered in

Westford, Massachusetts. Sonus is a provider of voice over IP infrastructure solutions that

enable voice services to be delivered over packet-based networks.

The plaintiffs purport to be Sonus shareholders and have brought their derivative suits

against most members of Sonus's board of directors and certain of its executive officers. The

essence of the complaints are: that six members of Sonus's board of directors and certain of its

---

[1] See Pre-Trial Order No. 1 consolidating Tillman v. Ahmed, et al., Suffolk No. 04-0754
BLS with Palma v. Ahmed, et al., Suffolk No. 04-0753 BLS and re-defining the caption of the
consolidated action as "In re Sonus Networks, Inc. Derivative Litigation."

executive officers, despite their responsibility for maintaining and establishing internal controls and ensuring that Sonus's financial statements were based on accurate financial information, permitted Sonus to issue false press releases regarding its financial statements; that the defendant Hassan Ahmed ("Ahmed"), Sonus's President and CEO, made false statements in three interviews regarding Sonus's financial condition, and he signed Sonus's allegedly incorrect financial statements; and that three of the directors, who served as members of the Sonus Audit Committee, approved the incorrect financial statements and, therefore, are direct participants in the wrongdoing. The complaints further charge that the defendant directors failed to prevent and permitted Sonus to file improper financial statements with the Securities and Exchange Commission and elsewhere. Allegedly, once the true condition of Sonus's financial situation came to light in January 2004, and thereafter, the Sonus stock price is said to have plummeted, erasing over $1 billion of the Company's market capitalization.

On February 20, 2004, the plaintiffs filed these derivative actions. The suits were not preceded by any demand, written or oral, that the board take any particular action with respect to the plaintiffs' allegations. Instead, the plaintiffs assert that any demand upon the members of the board would have been a "futile, wasteful and useless act."

Five of the seven present directors of Sonus are outside directors,[2] meaning they are not otherwise employees of Sonus. One of the outside directors, H. Brian Thompson ("Thompson"), has not been named as a defendant.[3]

---

[2] Ahmed and defendant Rubin Gruber are conceded by Sonus to be "inside directors/officers."

[3] The plaintiffs ask this Court not to consider the public filing by Sonus of Form 3 with the Securities and Exchange Commission ("S.E.C.") reflecting that Sonus's board of directors

2

The complaints themselves are lengthy and detailed, with allegations contained in 95 numbered paragraphs, many with subparagraphs and lengthy quotations from written materials, spread over 41 pages. The authors seem to have overlooked the dictates of Mass. R. Civ. P. Rule 8(a)(1) calling for a short and plain statement of the claim.

## DISCUSSION

Given Sonus's status as a Delaware corporation, much of the argument for and against the motions to dismiss cites to Delaware law. The law of a corporation's state of incorporation provides the circumstances under which a pre-suit demand would be futile. <u>Kamen</u> v. <u>Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 95-96 (1991); <u>Harhen</u> v. <u>Brown</u>, 431 Mass. 838, 844 (2000); <u>Bartlett</u> v. <u>New York, N.H., & H. R.R. Co.</u>, 221 Mass. 530, 538 (1915). Thus, this Court will begin by reciting some general principles of Delaware law that apply here.

The focus, principally, is on the issue of the absence and alleged futility of making a pre-suit demand on the Sonus board of directors.

> A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation. . . . The existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders. . . . Moreover, a stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management. The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the

---

[cont.] has seven members. The Court declines to cast a blind eye to this established fact. The plaintiffs' request is unusual, to say the least, given that this is a situation presenting the determination of whether pre-suit demand on the directors should be excused. Should the Court not be told how many directors there are? And, if so, why do the plaintiffs themselves, in the very first sentence of the Statement of Facts portion of their opposition, state: "The Complaint names an overwhelming majority -- six out of seven -- of the members of the Board of Directors as defendants. . . ?" Is the Court not entitled to know that there are seven?

3

company refused to assert a claim belonging to it. The nature of the action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.

By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits. Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.

Aronson v. Lewis, 473 A.2d 805, 811-812 (Del. Supr. 1984). See also Brehm v. Eisner, 746 A.2d 244, 253 (Del. Supr. 2000).

Whatever the underlying allegations, if a derivative plaintiff fails to carry the burden of demonstrating that demand should be excused, the complaint must be dismissed. Kaufman v. Belmont, 479 A.2d 282, 286 (Del. Ch. 1984).

If a plaintiff does not actually make demand prior to filing suit, he or she "must set forth ... particularized factual statements that are essential to the claim." Brehm, supra, 746 A.2d at 254. The pleading requirements of Rule 23.1 are "an exception to the general notice pleading standard" and "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss." Levine v. Smith, 591 A.2d 194, 207, 210 (Del. Supr. 1991).

The plaintiff is required to plead with particularity that "reasonable doubt" exists either that: (1) a majority of the board is disinterested and independent; or (2) that the challenged transaction was a valid exercise of business judgment. Aronson, supra, 473 A.2d at 814; Rales v. Blasband, 634 A.2d 927, 933 (Del. Supr. 1993). Thus, in determining demand futility, the Court "must make two inquiries, one into the independence and disinterestedness of the directors and

4

the other into the substantive nature of the challenged transaction and the board's approval

thereof." Id.

> To satisfy [the] requirement [of alleging with particularity the reasons for the
> plaintiff's failure to demand action from the board], the "stockholder plaintiff[]
> must overcome the powerful presumptions of the business judgment rule" by
> alleging sufficient particularized facts to support an inference that demand is
> excused because the board is "incapable of exercising its power and authority to
> pursue the derivative claims directly." In Aronson v. Lewis, we held that a
> demand on the board is excused only if the complaint contains particularized
> factual allegations raising a reasonable doubt that either: (1) "the directors are
> disinterested and independent" or "(2) the challenged transaction was otherwise
> the product of a valid exercise of business judgment."

White v. Panic, 783 A.2d 543, 551 (Del. Supr. 2001).

> However, the mere threat of personal liability for approving a questioned
> transaction, standing alone, is insufficient to challenge either the independence or
> disinterestedness of directors, although in rare cases a transaction may be so
> egregious on its face that board approval cannot meet the test of business
> judgment, and a substantial likelihood of director liability therefore exists.

Aronson, supra, 473 A.2d at 815.

"The question of independence flows from an analysis of the factual allegations

pertaining to the influences upon the directors' performance of their duties generally, and more

specifically in respect to the challenged transaction." Pogostin v. Rice, 480 A.2d 619, 624 (Del.

Supr. 1984).

The Court looks then at the question of whether a reasonable doubt is created that the

challenged transactions were other than the product of valid exercises of business judgment.

The challenged transactions relate to: (1) Sonus's maintaining and establishing internal

controls to ensure that Sonus's financial statements were based on accurate financial information;

Sonus's issuance of press releases regarding its financial statements; the defendant Ahmed's

5

statements, in three interviews, regarding Sonus's financial condition, and his signing of Sonus's

allegedly incorrect financial statements; the fact that three of the directors, who served as

members of the Sonus Audit Committee, approved the financial statements; and the fact that the

defendant directors failed to prevent and permitted Sonus to file improper financial statements

with the S.E.C. and elsewhere.

> "[There] is a very large – though not insurmountable – burden on stockholders
> who believe they should pursue the remedy of a derivative suit instead of selling
> their stock or seeking to reform or oust these directors from office.
>
> Delaware has pleading rules and an extensive judicial gloss on those rules
> that must be met in order for a stockholder to pursue a derivative remedy. Sound
> policy supports these rules, as we have noted. This Complaint, which is a
> blunderbuss of a mostly conclusory pleading, does not meet that burden, and it
> was properly dismissed.

Brehm, supra, 746 A.2d at 267.

What is challenged in the complaint are not specific actions by the board, but rather

generalized allegations reflecting poor supervision over financial statements, particularly with

regard to the controls over how they were prepared and the publication thereof to the S.E.C. and

the investing public. There are no particularized allegations as to any specific act by any

particular board member individually or by the board as a whole. See Rales, supra, 634 A.2d. at

933.

Thus, here, a reading of the complaints, however lengthy, cannot be said to provide to the

Court – and it is the Court, not the plaintiffs, that must harbor this doubt – a "reasonable doubt"

that any activities by the directors, individually or as a group, were other than the product of valid

6

exercises of business judgment.[4]

The Court next turns to the issue of the disinterestedness and independence of the board members. A presumption of propriety must be the starting point in the absence of clear allegations to the contrary. Aronson, supra, 473 A.2d. at 812, 815. See also Grimes v. Donald, 673 A.2d 1207, 1216 (Del. 1996).

As noted above, the Sonus board has seven members, five outside directors and Ahmed and Gruber. One of the outside directors, Thompson, has not been named as a defendant.[5] Consequently, he must be deemed disinterested without further discussion. The Court will, therefore, consider the status of the pleadings relating to the remaining four outside directors: Edward T. Anderson ("Anderson"), Paul J. Ferri ("Ferri"), Albert A. Notini ("Notini") and Paul J. Severino ("Severino").

It is alleged that Anderson sold certain Sonus stock, allegedly at a significant profit and on insider information. The details, however, are scant. "[T]he mere fact that stocks were traded by . . . [a] director does not establish a breach of the duty of loyalty." McCall v. Scott, 239 F.3d 808, 825 (6th Cir. 2001); Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1224 (1st Cir. 1996).

Further, according to Form 4 filed with the S.E.C. on July 22, 2003, Anderson's stock

---

[4] If the test was whether "there is a reasonable inference that the business judgment rule is not applicable," [emphasis added], as applied below in Aronson by the Vice Chancellor, this Court might well reach a different conclusion. But the Vice Chancellor was specifically overruled on that issue by the Delaware Supreme Court. See Aronson, supra, 473 A.2d at 814.

[5] The complaints were each filed on February 20, 2004, and the defendants' motions to dismiss revealing Thompson's existence as a director were served on March 22, 2004. The plaintiffs' have yet, however, to take any steps to add Thompson as a party. Apparently, they prefer to have this Court decide the present motions and thereafter seek leave to amend their complaints. That is not the order of preference for this Court. The complaints will live or die as written when the arguments were presented to the Court.

sale occurred on July 18, 2003, and was stock "held in trust for the benefit of his family and minor children," not shares personally held by him. This sale was over six months before the January 2004 announcement of Sonus's financial reporting problems. And the complaints contain no particularized allegations of facts that would demonstrate any impropriety with Anderson's stock sale. Consequently, this Court cannot, on this charge, conclude that Anderson lacks the independence necessary, or is too interested, to be considered other than a disinterested and independent director of Sonus.

As to all of the directors, there is an absence of specific or particularized allegations regarding how they would have been put on notice of any accounting problems or improprieties. Thus, again, this is no basis for excusing a demand. See, e.g, Guttman v. Huang, 823 A.2d 492, 498 (Del. Ch. 2003).

There are allegations that Ferri and Severino, by virtue of their positions on Sonus's Compensation Committee, exert control over fellow board members. Again, however, there are no particularized allegations of any interest on the part of these allegedly controlling directors that would render them less than disinterested and independent. See Brehm, supra, 746 A.2d at 258. See also White v. Panic, 793 A.2d 356, 366 (Del. Ch. 2000); Langner v. Brown, 913 F. Supp. 260, 266 (S.D.N.Y. 1996).

Again there are some allegations about different business relationships shared among or between some of the directors. Directors are not, however, interested or lacking in independence merely because they share outside professional associations or relationships. Kohls v. Duthie, 765 A.2d 1274, 1284 (Del. Ch. 2000); Green v. Phillpis, C.A. No. 14436, 1996 WL 342093, at *5 (Del. Ch. June 19, 1996). "There is nothing sinister or corrupt in the single fact of association

8

or affiliation in financial matters. There must be some further fact before there is anything wrong about it." <u>Bartlett, supra,</u> 221 Mass. at 537. No reasonable doubts are raised by the relationships alleged here.

Lastly, the conclusory allegations about generalized misconduct establishing personal liability and those about insurance coverage are insufficient to excuse the demand requirement. See <u>Seminaris</u> v. <u>Landa,</u> 662 A.2d 1350, 1354 (Del. Ch. 1995); <u>Rales, supra,</u> 634 A.2d at 936; <u>Kaufman, supra,</u> 479 A.2d at 287; <u>Aronson, supra,</u> 473 A.2d at 817-818. "Demand is not excused simply because plaintiff has chosen to sue all directors. . . . To hold otherwise would permit plaintiffs to subvert the particularity requirements of Rule 23.1 simply be designating all directors as targets." <u>Grimes, supra,</u> 673 A.2d at 1216 n.8.

Demand has not been shown to be excused in these cases.

The Court does not assess in any way the other contentions by the defendants in support of their motions to dismiss.

As a result of the foregoing analysis of Delaware law and a review of the complaints, this Court concludes that the complaints must be dismissed. Further, the Court accepts the Delaware Supreme Court's reasoning that such dismissal ought to be without leave to further amend. See <u>White, supra,</u> 783 A.2d at 555.

9

ORDER

For the foregoing reasons, the Defendants' Motions to Dismiss the Complaint, as amended, (Paper #11 in case No. 04-0753 BLS and Paper #13 in case No. 04-0754 BLS) are <u>ALLOWED</u>, without leave to amend.  Final judgment shall enter accordingly, dismissing the cases, with each party to bear his or its own costs.

Allan van Gestel
Justice of the Superior Court

DATED:        September 27, 2004

# COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT

SUFFOLK, ss
BUSINESS LITIGATION SESSION

*04-0754-12L5*

---

BRIAN TILLMAN, Derivatively on Behalf of )
SONUS NETWORKS, INC. )
                                                                      )
                        Plaintiff,        )
                                                                      )
    vs.                                           )
                                                                      )
HASSAN M. AHMED, RUBIN GRUBER, )
EDWARD T. ANDERSON, PAUL J. FERRI, )
ALBERT A. NOTINI, PAUL J. SEVERINO, )
PAUL R. JONES, EDWARD N. HARRIS, J. )
MICHAEL O'HARA and STEVEN J. NILL, )
                                                                      )
                        Defendants,        )
                                                                      )
    -and-                                        )
                                                                      )
                                                                      )
SONUS NETWORKS, INC., a Delaware )
corporation,                                   )
                                                                      )
                        Nominal Defendant. )
                                                                      )

---

Civil Action No.

DERIVATIVE ACTION

DEMAND FOR JURY TRIAL

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

I.

## INTRODUCTION

1.     This is a shareholder derivative action brought in the right of and for the benefit of nominal defendant Sonus Networks, Inc. ("Sonus" or the "Company") against its Board of Directors (the "Board") and certain of its officers seeking to remedy defendants' breaches of fiduciary duties and other violations of law arising out of false statements made to the investing public between the period April 9, 2003 through February 11, 2004 (the "Relevant Period"). Defendants' misconduct has caused severe, irreparable injury and damages to the Company, particularly to its reputation and goodwill in the investment and business community, has exposed the Company to millions of dollars in potential liability for violations of law, has caused the Company to lose more than $1.2 billion in market capitalization or 46% of the Company, to be downgraded by multiple analysts, and threatens to virtually destroy this once valuable franchise.

II.

## SUMMARY OF THE ACTION

2.     Sonus is a provider of voice infrastructure solutions for the new public network. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the public network. The Company's suite of voice infrastructure solutions includes the GSX9000 Open Services Switch, in Insignus Softswitch and the Sonus Insight

2

Management System.

3.　On January 20, 2004, shares of Sonus closed at $9.91 per share representing a two-year closing high. In fact, Sonus shares had jumped over 800% in the preceding year. However, after the close of the market on the 20th, Sonus announced that it was delaying the release of its Q4 and full year 2003 financial results pending the completion of its Fiscal Year ("FY") 2003 audit. On this news, the stock plunged 18.7%, or $1.85 per share in after-hours trading eventually closing on the 21st at $8.93 on unusually large trading.

4.　On February 11, 2004, Sonus, after the close of trading, stunned the market and investing public when it announced that it had identified certain issues, practices and actions of certain employees relating to both timing of revenue recognition from certain customer transactions and to certain other financial statement accounts, which may affect the Company's FY 2003 financial statements and possibly financial statements for prior periods. The Company also stated in was reassessing the proper periods in which revenue should be recognized for these transactions. Defendant Hassan Ahmed ("Ahmed"), President and Chief Executive Officer ("CEO"), commented on the shocking revelation, stating in relevant part:

> "We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting."

5.　The next day the Company's stock plummeted eventually closing at $5.39 at the close of trading on the 12th on extremely heaving trading on the day of over 96 million shares.

6.　Thus, since the Company's announcement on January 20, 2004 that it would be delaying the release of its Q4 financial statements due to an audit, *the defendants actions have erased 46% of the Company's market capitalization, or about $1.2 billion dollars.*

3

7.    On February 12, 2004, the Company was downgraded by numerous analysts including Wachovia, Goldman Sachs, Legg Mason and Smith Barney. Furthermore, the Company has had to waste valuable corporate assets by hiring the law firm of Hale and Dorr LLP ("Hale and Dorr") and PricewaterhouseCoopers to conduct an independent investigation into the wrongdoing alleged herein. The Company also had to notify the Securities and Exchange Commission ("SEC") of this investigation.

8.    Throughout the duration of the Relevant Period, Sonus' stock traded at artificially inflated levels based on these false financial results and statements. Certain defendants and Company insiders took further advantage, disposing of 264,334 shares of Sonus stock during the Relevant Period at prices as high as $8.58 per share, illegally and in breach of their fiduciary duties reaping profits of nearly $2 million dollars.

9.    The financial statements of the Company made during the Relevant Period, all of which implicitly and/or expressly were prepared in conformity with Generally Accepted Accounting Principals ("GAAP"), were materially false and misleading because defendants caused the Company to materially overstate its earnings during the Relevant Period, which also had the effect of overstating assets. Sonus will have to admit that it inappropriately recorded transactions included in its FY 2003 results, and will have to restate those results to remove millions in improperly reported revenues, such that its FY 2003 financial statements were not a fair presentation of Sonus' results and were presented in violation of GAAP.

10.    As a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations the of securities laws and regulations and has been named in numerous federal securities class action lawsuits filed in the United States

District Court for the District of Massachusetts, on behalf of investors who purchased Sonus' shares.

These lawsuits allege that investors purchased shares of the Company based on false and materially

misleading statements regarding the financial condition of the Company and that they have been

significantly damaged thereby. Specifically, those actions allege that defendants failed to disclose

and/or misrepresented the following facts, among others: (a) that defendants had improperly and

untimely recognized revenue on certain of the Company's customer transactions; (b) that defendants

violated GAAP; and (c) as a result of the foregoing, the Company's revenues, net income and

earnings per share published during the Relevant Period were materially false and misleading. These

actions also allege the defendants used the Company's artificially inflated stock price to complete a

public offering of 20 million shares of the Company's stock. This will subject the Company to strict

liability under Section 11 of the Securities Act of 1933 for filing a false and misleading registration

statement in connection with the offering.

### III.

### JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Mass. Gen. Laws Ann. Ch.

212 §4 (2004) and Mass. R. Civ. P. Rule 23.1.

12.    Jurisdiction is proper in the Commonwealth because nominal defendant Sonus is

headquartered in this state. A substantial portion of the transactions and wrongs complained of

herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred

in this state. One or more of the defendants either resides in or maintains executive offices in this

state, and defendants have received substantial compensation in this state by engaging in numerous

activities and conducting business here, which had an effect in this state. Venue is proper in this

county pursuant to Superior Court Administrative Directive #03-1.

## IV.

## PARTIES

13.    Plaintiff Brian Tillman, is and was at relevant times complained of herein, a shareholder of nominal defendant Sonus.

14.    Nominal defendant Sonus is a Delaware corporation with its principal executive offices located at 5 Carlisle Road, Westford, MA 01886.

15.    Defendant Ahmed was, at all relevant times, a director of Sonus, its President and CEO. As an officer and director of Sonus, Ahmed owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as its President and CEO, Ahmed had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Ahmed owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Ahmed, as CEO, signed the Company's false financial statements and therefore Ahmed is a direct participant in the wrongdoing. North Bridge Venture Partners and Matrix Partners, two prominent venture capitalist firms, both made significant venture investments in Sonus and have made millions of dollars as a result of their investments in Sonus. Defendant Edward T. Anderson ("Anderson") is a managing partner at Bridge Venture Partners and defendant Paul J. Ferri ("Ferri") is a general partner of Matrix Partners. Both Anderson

6

and Ferri serve as directors of Sonus and both are on the Company's Audit Committee. Ahmed also served on the board of Winphoria Networks along with Ferri. Matrix Partners and North Bridge Partners were both venture capitalist in Winphoria Networks. Moreover, Ferri serves on Sonus' Compensation Committee which determines Ahmed's salary, bonuses and stock options. Ahmed, along with defendant Rubin Gruber ("Gruber"), co-founder of Sonus, initially invested in Narad Networks, a start-up telecommunications company also located in Westford, MA, along with Gruber. By virtue of his executive positions with the Company, his personal participation in the underlying misconduct and his extensive and long-term personal, professional, and financial relationships with Anderson, Gruber and Ferri, and the other members of the Sonus Board, Ahmed is not independent, is not disinterested and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

16.     Defendant Gruber was, at all relevant times, a director and Chairman of the Board of Sonus. Gruber was one of the founders of Sonus. As a director of Sonus, Gruber owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.    Moreover, as its Chairman, Gruber had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Gruber owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As detailed in the preceding paragraph, North Bridge Venture Partners and Matrix Partners, two prominent venture capitalist firms, both

7

made significant venture investments in Sonus and have made millions of dollars as a result of their investments in Sonus. Defendant Anderson is a managing partner at Bridge Venture Partners and defendant Ferri is a general partner of Matrix Partners. Both Anderson and Ferri serve as directors of Sonus and both are on the Company's Audit Committee. Moreover, Ferri serves on Sonus' Compensation Committee which determines Gruber's salary, bonuses and stock options. Gruber along with Ahmed initially invested in Narad Networks, a startup telecommunications company also located in Westford, MA. By virtue of his positions with the Company, his personal participation in the underlying misconduct and his extensive and long-term personal, professional, and financial relationships with Anderson and Ferri, and the other members of the Sonus Board, Gruber is not independent, is not disinterested and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

17.    Defendant Anderson was, at all relevant times, a director of Sonus and a member of its Audit Committee. As a director of Sonus, Anderson owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Audit Committee, Anderson had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Anderson owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully,

8

recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of the Audit Committee, Anderson approved the Company's financial statements and therefore Anderson is a direct participant in the wrongdoing. Moreover, during the Relevant Period, Anderson engaged in massive insider trading disposing of 65,584 shares of his personally held Sonus stock for proceeds of $448,918.34. As detailed above, North Bridge Venture Partners and Matrix Partners, two prominent venture capitalist firms, both made significant venture investments in Sonus and have made millions of dollars as a result of their investments in Sonus. Defendant Anderson is a managing partner at Bridge Venture Partners and defendant Ferri is a general partner of Matrix Partners. Both Anderson and Ferri serve as directors of Sonus and both are on the Company's Audit Committee. In addition, defendant Ahmed also served on the board of Winphoria Networks along with Ferri. Matrix Partners and North Bridge Partners, in which Anderson is a managing partner, were both venture capitalist in Winphoria Networks. By virtue of his positions with the Company, his massive stock sales, his personal participation in the underlying misconduct and his extensive and long-term personal, professional, and financial relationships with Ahmed, Gruber and Ferri, and the other members of the Sonus Board, Anderson is not independent, is not disinterested and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

18.    Defendant Albert A. Notini ("Notini") was, at all relevant times, a director of Sonus. As a director of Sonus, Notini owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Rather than fulfill these important fiduciary duties Notini owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus

9

by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Notini was previously a Senior Partner at the Boston law firm of Hale and Dorr, the same firm the Company has hired to conduct an independent investigation into the wrongdoing alleged herein.

19.    Defendant Ferri was, at all relevant times, a director of Sonus and a member of its Audit and Compensation Committees. As a director of Sonus, Ferri owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Audit and Compensation Committees, Ferri had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Ferri owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of the Audit Committee, Ferri approved the Company's financial statements and therefore Ferri is a direct participant in the wrongdoing. Moreover, Ferri serves on Sonus' Compensation Committee which determines Ahmed and Gruber's salary, bonuses and stock options. As detailed above, North Bridge Venture Partners and Matrix Partners, two prominent venture capitalist firms, both made significant venture investments in Sonus and have made millions of dollars as a result of their investments in Sonus. Defendant Anderson is a managing partner at Bridge Venture Partners and defendant Ferri is a general partner of Matrix Partners. Both Anderson and Ferri serve as

10

directors of Sonus and both are on the Company's Audit Committee. In addition, defendant Ahmed also served on the board of Winphoria Networks along with Ferri. Matrix Partners and North Bridge Partners, in which Anderson is a managing partner, were both venture capitalist in Winphoria Networks. By virtue of his positions with the Company, his personal participation in the underlying misconduct and his extensive and long-term personal, professional, and financial relationships with Ahmed, Gruber and Anderson, and the other members of the Sonus Board, Ferri is not independent, is not disinterested and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

20.    Defendant Paul J. Severino ("Severino") was, at all relevant times, a director of Sonus and a member of its Audit and Compensation Committees. As a director of Sonus, Severino owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Audit and Compensation Committees, Severino had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Severino owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of the Audit Committee, Severino approved the Company's financial statements and therefore Severino is a direct participant in the wrongdoing. Moreover,

11

Severino serves on Sonus' Compensation Committee which determines Ahmed and Gruber's salary, bonuses and stock options. Severino also served on the board of PhotonEx Corp., another telecommunications start-up from Massachusetts, along with defendant Ahmed. By virtue of his executive positions with the Company, his personal participation in the underlying misconduct and his extensive and long-term personal, professional, and financial relationships with Ahmed, and the other members of the Sonus Board, Anderson is not independent, is not disinterested and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

21.     Defendant Edward N. Harris ("Harris") was, at all relevant times, a Vice President of Sonus. As an officer of Sonus, Harris owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a Vice President, Harris had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Harris owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Harris engaged in massive insider trading disposing of 30,000 shares of his personally held Sonus stock for proceeds of $204,600.

22.     Defendant J. Michael O'Hara ("O'Hara") was, at all relevant times, a Vice President of Sonus. As an officer of Sonus, O'Hara owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a Vice President, O'Hara had also assumed important managerial responsibilities at Sonus which required

12

him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties O'Hara owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, O'Hara engaged in massive insider trading disposing of 68,750 shares of his personally held Sonus stock for proceeds of $489,613.

23.     Defendant Paul R. Jones ("Jones") was, at all relevant times, a Vice President of Sonus. As an officer of Sonus, Jones owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a Vice President, Jones had also assumed important managerial responsibilities at Sonus which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Jones owed to Sonus and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Jones engaged in massive insider trading disposing of 100,000 shares of his personally held Sonus stock for proceeds of $857,500.

24.     Defendant Stephen J. Nill ("Nill") was, at all relevant times, Chief Financial Officer ("CFO") of Sonus. As an officer of Sonus, Nill owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CFO, Nill had also assumed important managerial responsibilities at Sonus which required him to be well

13

informed about the day-to-day operations of the Company particularly, as a member of the Audit

Committee, with respect to the Company's internal systems of accounting controls and procedures,

and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these

important fiduciary duties Nill owed to Sonus and its shareholders he, upon information and belief,

actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts

or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Sonus

by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During

the Relevant Period, Nill as CFO, signed the Company's false and misleading financial statements.

     25.     The Defendants identified above in ¶¶ 15-24 are collectively referred to hereinafter as

the "Individual Defendants." For demand futility purposes, the defendants identified in ¶¶ 15-20,

who make up the current Board of Sonus, are referred to as the "Director Defendants." The

Defendants identified in ¶¶ 17, 21-23 are referred to as the "Insider Selling Defendants."

V.

**FACTUAL ALLEGATIONS**

     26.     On January 20, 2004, shares of Sonus closed at $9.91 per share representing a two-

year closing high. In fact, Sonus shares had jumped over 800% in the preceding year. However,

after the close of the market on the 20th, the Individual Defendants caused the Company to issue a

press release entitled "Sonus Networks Delays Release of Its Q4 and FY2003 Financial Results." The

press release stated in relevant part:

> Sonus Networks today postponed the release of its Q4 and full year 2003 financial
> results pending the completion of its 2003 audit. Upon completion of the audit, the
> Company will reschedule the conference call and provide further details.

     27.     On this news, shares of Sonus plunged 18.7%, or $1.85 per share in after-hours

14

trading eventually closing on the 21st at $8.93 on unusually large trading.

28.   Then, on February 11, 2004, Sonus, after the close of trading, stunned the market and investing public when it announced that it had identified certain issues, practices and actions of certain employees relating to both timing of revenue recognition from certain customer transactions and to certain other financial statement accounts, which may affect the Company's FY 2003 financial statements and possibly financial statements for prior periods. The Company also stated in was reassessing the proper periods in which revenue should be recognized for these transactions. On that date, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Provides Update on Status of Its Q4 and FY2003 Financial Results." The press release stated in relevant part:

> Sonus Networks today provided additional information regarding the delay in reporting its fourth quarter and full fiscal year financial results for the year ended December 31, 2003. In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.
>
> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.
>
> In response to the issues identified, the Company has taken the following steps:
>
> •   The Company is performing a detailed review of the revenue timing issues and practices and of certain other financial statement accounts.

15

- The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.

- The Company has terminated certain non-executive employees.

- Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.

"We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.

29.    The next day the Company's stock plummeted eventually closing at $5.39 at the close of trading on the 12th on extremely heaving trading on the day over of 96 million shares.

30.    Since the Company's announcement on January 20, 2004 that it would be delaying the release of its Q4 financial statements due to an audit, *the defendants actions have erased 46% of the Company's market capitalization, or about $1.2 billion.*

31.    On February 12, 2004, the Company was downgraded by numerous analysts including Wachovia, Goldman Sachs, Legg Mason and Smith Barney.

32.    The Individual Defendants' conduct has resulted in certain analysts suspended their ratings and estimates on the Company. In a first-call analyst report issued by Thomas Weisel Partners LLC entitled "SONS: Suspending Rating and Estimates" stated in relevant part.

SONS indefinitely delays reporting 4Q03 and FY03 results citing issues with timing of revenue recognition and "unethical" activities by certain employees. After SONS delayed its earnings call on Jan 20th, we advised investors to stay on the sidelines until further clarification was available from company. In a press release this evening (2/11), SONS stated that there may be restatements to its 2003 (and possibly previous years') financial statements and that certain non-executive employees had been fired due to "unethical" practices related to this issue. *In light of these new revelations, the historical basis of our model may be suspect and given the uncertainty regarding the magnitude and timing of resolution of this issue we are suspending our rating and estimates.*

Highlights from the press release: (1) Independent auditors have identified "certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts." (2) What is at dispute here is "timing" of revenue recognition and not whether these revenues should have been recorded in the first place as the equipment has been delivered, customers are using them and the company has already received cash or is receiving cash for these products in the ordinary course of business. (3) Certain non-executive employees related to this matter have already been fired fired. (4) SONS may have to restate its financial statements by decreasing (or increasing) revenues or deferred revenues for these prior periods. (5) Given that the Company has no idea as to when an audit will be completed, SONS declined to provide a definitive date for reporting 4Q03 and FY03 results.

*Suspending rating and estimates pending resolution. There are significant uncertainties that have emerged in the SONS story: (1) magnitude of revenue restatements are unknown, which makes the historical basis of our model suspect. (2) Timing of an eventual resolution is uncertain. (3) Other complexities may emerge like a potential SEC investigation. (4) Other "hard to quantify" issues such as potential delays in customer acceptance as they wait for this issue to be resolved, management preoccupation in resolving this issue, etc. With these potential risks in mind, we are suspending our rating and estimates on SONS pending resolution to this issue.*

33.    An article appearing in *TheMotleyFool.com* by Bill Mann entitled "Sonus: Not Buying It" referred to the Company's February 11, 2004 announcement as a "bombshell" and questioned both the Company's timing of the announcement and its "non-executive" firing. The article stated in relevant part:

17

After the close of trading yesterday, Sonus Networks announced that it had found revenue recognition problems and had fired several "non-executive employees" as a result. The high-flying provider of telecommunications infrastructure equipment saw its shares get sliced by 11% yesterday, on 10 times the average trading volume, and it's off another 20%-plus today in heavy trading.

The company has surged in the last year on the back of capital spending increases at big telecom firms such as Verizon and AT&T, as well as the speculative mania over Voice over Internet Protocol (VOPI). But since it announced on Jan. 20 that it would be delaying release of its fourth-quarter financial statements due to an audit, it has shed 46% of its market capitalization, or $1.2 billion dollars.

*There are a number of problems with this story. First and foremost, the news of the findings came out after yesterday's close, and yet the stock began tanking with huge volume at around 11 a.m. – several hours before any official comments by the company. That smells an awful lot like the news was leaked before it was released to the public. Certainly, stocks that have attracted momentum investors can drop on very little provocation. But Sonus investors suddenly turned over nearly 20% of its float on absolutely no news at all? That's difficult to swallow.*

*I'm not assuming that the company's officers have done anything wrong, but I don't think it's far-fetched to suggest that someone let the cat out of the bag in advance – the trading pattern certainly suggests it. And this isn't some "reaffirming guidance" kind of communique - it was a bombshell.*

*Second, the whole "non-executive" firing thing sounds a heck of a lot like scapegoating. The company claims the problem is with revenue recognition for certain accounts. It says the equipment in question has been bought and already deployed. That's certainly better than some of the alternatives, like someone was throwing equipment off the back of the truck and declaring it sold. But given the company's business model, it's still extremely troubling.*

*According to its (now suspect) mid-year 2003 filing, Sonus generates 70% of its revenue from equipment sales, and about 30% from back-end services. It sells either directly to end customers, or to a distribution network. Its services are accounted for on an "as-provided" basis, which is conservative accounting. So, since the equipment in question has already been delivered to the end customer, as stated by the company, it would mean that Sonus was booking revenues for services that it never provided to customers. Worse, management noted that these improper revenues occurred 2003, and possibly went back to previous years.*

*That's a disaster, because companies are either providing services, or they are not. For management to have missed such activity for an extended period of*

18



*time is inexcusable. So while it may be great that it has identified and eliminated wrongdoers, this sounds like a much deeper problem.*

Shares of Sonus Networks Inc. sank Thursday after the firm identified an accounting problem and said it can't predict when it will release financial results for 2003.

34.    An article dated February 12, 2004 on the *Dow Jones Business News* entitled "Sonus Shares Slide on News of Accounting Problems" stated in relevant part:

Sonus, a Westford, Mass., maker of equipment for telecommunications carriers, said revenue for some contracts may have been booked in the wrong quarter, which could force the company to restate financial results for 2003 and possibly prior periods. Several nonexecutive Sonus employees have been fired following the discovery and a further audit is ongoing, the company said.

Sonus delayed its 2003 annual report on Jan. 20, saying it needed more time to audit its books. Sonus shares have fallen almost 50% since, backing off the year high of $10 set that day.

At its peak, in August 2000, the stock changed hands at more than $90 a share.

*Several analysts urged caution Thursday, downgrading the ratings on Sonus shares.*

*"The underlying business remains healthy for the company, " wrote Goldman Sachs analyst Brantley Thompson in a note to clients. However, Mr. Thompson cut the stock to "underperform" from "in-line," explaining that "the uncertainty around the audit outweighs the health of business, and as a result, we are downgrading the shares."*

*Legg Mason analyst Timm Bechter offered a similar rationale in downgrading his Sonus rating to "hold" from "buy."*

*"We believe this issue will be an overhang on the shares until the company reports earnings and completes the audit," Mr. Bechter wrote.*

## IMPROPER STATEMENTS AND INSIDER TRADING DURING THE RELEVANT PERIOD

35.    On April 9, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Reports 2003 First Quarter Financial Results; Revenues Increase 27% Sequentially, Loss Narrows to $0.02 Per Share." The press release stated in relevant part:

> Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, today reported its financial results for the first quarter ended March 31, 2003, in accordance with U.S. generally accepted accounting principles (GAAP).
>
> Revenues for the first quarter of fiscal 2003 were $16.0 million compared with $12.7 million in the fourth quarter of fiscal 2002. Net loss for the first quarter of fiscal 2003 was $4.4 million or $0.02 per share compared with a net loss for the fourth quarter of fiscal 2002 of $12.8 million or $0.07 per share. Revenues for the first quarter of fiscal 2002 were $21.2 million and the net loss for the first quarter of fiscal 2002 was $16.2 million or $0.09 per share.
>
> *"Our financial results for the first quarter reflected good progress toward our business objectives," said Hassan Ahmed, president and CEO, Sonus Networks. "We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family."*

36.    On April 22, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Announces Sale of 20 Million Shares of Common Stock." The press release stated in relevant part:

> Sonus Networks, a leading provider of voice infrastructure solutions for the new public network, today announced that it has completed a public offering of 20 million shares of Common Stock at a per share price of $3.05. The offering was made under an effective registration statement.
>
> *"Enhancing our financial strength has been an important component of our strategy as we seek to expand our partnerships with some of the world's largest service providers," said Hassan Ahmed, president and CEO, Sonus Networks. "The financial transaction announced today bolsters our balance sheet, and positions us to build on our success in providing the next-generation, carrier-class solutions that enable voice services to be delivered over packet-based networks."*

20

37.    On June 5, 2003, *CNNFN* issued a transcript of an interview with defendant Ahmed

which stated in relevant part:

> DASS: Your stock price has seen an amazing run. We were just putting up
> the chart there a few minutes ago. What are going to be the key drivers to keep that
> momentum going?
>
> *AHMED: Well, as I said, I think the – we're approaching certainly 2003*
> *with an awful lot of confident [sic] because we're seeing not only a transition of*
> *the way people are – way carriers are spending their capital towards the types of*
> *things that we do, but we're also seeing a much broader customer base looking at*
> *deploying or moving forward with deployment of this technology. So we see a*
> *broader set of carriers moving forward. We see – we see capital being devoted to*
> *this.*
> *And we, in general, find that every – ultimately every carrier in the world is*
> *going to make a transition to packet-oriented network. This is the way networks of*
> *the future will be built. Some of them have already voted and started down this*
> *path with us and we feel that there are a lot more to follow. So I think the catalysts*
> *are very strong for people building out this infrastructure.*

38.    On July 10, 2003, the Individual Defendants caused the Company to issue a press

release entitled "Sonus Networks Reports 2003 Second Quarter Financial Results." The press release

stated in relevant part:

> Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new
> public network, Thursday reported its financial results for the second quarter ended
> June 30, 2003.
>
> Revenues for the second quarter of fiscal 2003 were $21.4 million compared
> with $16.0 million for the first quarter of fiscal 2003 and $21.3 million for the second
> quarter of fiscal 2002. Net loss for the second quarter of fiscal 2003 was $3.2 million
> or $0.01 per share compared with a net loss for the first quarter of fiscal 2003 of $4.4
> million or $0.02 per share and a net loss of $17.8 million or $0.09 per share for the
> second quarter of fiscal 2002.
>
> Revenues for the first six months of fiscal 2003 were $37.4 million compared
> with $42.5 million in the same period last year. Net loss for the first six months of
> fiscal 2003 was $7.6 million or $0.04 per share compared with a net loss for the first
> six months of fiscal 2002 of $34.0 million or $0.18 per share.

21

39.    On July 18, 2003, *Bloomberg* issued a release entitled "Sonus is 'Driving Toward Profitability,' Chief Executive Says." The press release stated in relevant part:

> Sonus Networks Inc., a telecommunications-equipment maker, is trying to become profitable, Chief Executive Officer Hassan Ahmed said.
>
> *"We're definitely driving toward profitability as fast as we can," Ahmed said in a televised interview with Bloomberg News. He said he hasn't given guidance on the third quarter and whether Sonus would post a profit.*
>
> *Ahmed said the company expects sales from outside the U.S. to eventually increase to 50 percent of its total revenue.*

40.    On July 18, 2003, defendant Harris sold 30,000 Sonus shares at $6.82 per share, for proceeds of $204,600.

41.    On July 22, 2003, defendant O'Hara sold 55,000 Sonus shares at $6.82-$7.03 per share, for proceeds of $381,200.

42.    On August 1, 2003, the Individual Defendants caused the Company to issue a press release entitled, "Sonus Networks Issues Statement Regarding Incorrect Report On Financial Guidance." The press release stated in relevant part:

> Sonus Networks today issued the following statement regarding erroneous and false information reported by Multex on July 31. An article appeared on Multex Investor indicating that Sonus Networks had revised its financial guidance for Q3 FY2003 and for the fiscal year 2003. The information included in the article was incorrect and was not provided by the company.
>
> *With regard to its projected future results, Sonus Networks refers you to the financial guidance provided as part of its Q2 quarterly financial conference call on July 10, 2003, which included, among other things, that it expects its revenues to increase in the third quarter of FY2003 by 15-20% over reported second quarter 2003 revenues of $21.4 million. For more detailed information on the guidance provided by the company, please refer to the webcast of this conference call, which can be accessed in the Investor Relations section of Sonus' web site at www.sonusnet.com.*

22

43.    On October 8, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Reports 2003 Third Quarter Financial Results; Rev Grow 34% Sequentially, 285% Over Previous Year; Company Achieves Quarterly Profit."  The press release stated in relevant part:

Sonus Networks Inc. - Westford, Mass.

| 3rd Quar Sept. 30: | 2003 | 2002 |
|---|---|---|
| Revenue | $28,644 | $7,445 |
| Net income | 1,209 | (21,638) |
| Avg shrs (diluted) | 239,446 | 191,823 |
| Shr earns | | |
| Net income | .01 | (.11) |

Figures in parentheses are losses.

Excluding amortization [sic] of stock-based compensation, amortization of goodwill and purchased intangible assets, and the write-off of goodwill, Sonus earned $2.35 million, or a penny a share, in the latest quarter, up from a loss of $14.6 million, or 8 cents a share, a year ago.

Analysts had expected the company to lose a penny a share for the quarter, according to a survey of analysts compiled by Thomson First Call.

Shares of Sonus closed the regular session Wednesday at $8.30, up 27 cents a share, or 3.4%.  In after-hours trading, shares rose further to $8.93 a share.

44.    On October 9, 2003, *Bloomberg* issued a release entitled "Sonus Networks' Ahmed on Earnings Outlook."  The release stated in relevant part:

Hassan Ahmed, chief executive of Sonus Networks Inc., talks with Bloomberg's Carol Massar from Boston about the company's third-quarter profit, spending by telecommunications companies and outlook for earnings growth.  Sonus, a telecommunications-equipment maker, reported net income of $1.2 million, its first-ever quarterly profit.
                        ***
AHMED:  Good morning, Carol.  How are you?

23

MASSAR: I'm doing well. And your stock's doing well in the pre-market. It is trading higher already. Investors certainly seem improved [sic] with your earnings results. What was the reason behind the earnings improvement?

AHMED: Well, one of the things that we've been able to do this year is consistently grow our top line, our revenues, based on not only the strength of our existing customers but the addition of major new customers such as Verizon, for example, into the mix. And so, our top line has grown. We've been managing our expenses very carefully and all that's led to a profit. And also, we generated about $4 million in cash from operations.

MASSAR: Viewing the marketplace really, we're not seeing a lot of companies spending, and now you're saying that we were starting to see that. My understanding is that earnings will improve because companies like Qwest and Global are stepping up their spending. Who else is placing orders with you guys?

AHMED: Well, you know, it's interesting, the – in our marketplace what's happening is that while overall telecom spending still isn't increasing carriers are being much more careful about how they're spending the money, and they're shifting expenditure towards their next-generation networks. And what we do in terms of building next-gen voice networks has – is a very high priority for a number of these carriers. So, really across the board in the U.S. as well as overseas we're seeing carriers take packet collecting and voice-over-IP technology a lot more seriously and stepping up to deploying it.

*MASSAR: What does that mean for your earnings going forward then?*

*AHMED: Well, certainly a big part of our focus is on growing our company and broadening our customer base. So, we're very much focused on continuing to grow the top line in our company and, obviously as a result of that, grow the bottom line.*

*MASSAR: What about the bottom line? Take this quarter. Analyst consensus expecting earnings to be flat. Is that what you're expecting at this point?*

*AHMED: We're – our guidance that we offered last night certainly is for earnings to come in about the same level as it did this quarter and for the top line to grow somewhere between 10 and 15 percent.*

45.    On October 10, 2003, defendant Jones sold 100,000 Sonus shares at $8.575 per share,

for proceeds of $875,000.

46.    On October 18, 2003, defendant Anderson sold 65,584 Sonus shares at $$6.84-$6.85

per share, for proceeds of $448,918.34.

47.    On October 22, 2003, defendant O'Hara sold 13,750 Sonus shares at $7.85-$7.91 per

share, for proceeds of $108,413.

48.    On January 20, 2004, *Bloomberg* issued a release entitled "Sonus Networks Delays

Release of 4th-Qtr Results Pending Audit." The release stated in relevant part:

> Sonus Networks Inc., a maker of switches and networking equipment for Internet
> calling, said it delayed the release of its fourth-quarter results pending the completion
> of an audit.

## IMPROPER FINANCIAL REPORTING

49.    The Individual Defendants, particularly management and the members of the Audit

Committee, were responsible for maintaining and establishing adequate internal controls for Sonus

and to ensure that the Company's financial statements were based on accurate financial information.

According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing,

and reporting financial data, a corporation must establish an internal accounting control structure.

Among other things, the Individual Defendants were required under GAAP, to:

> (1)    Make and keep books, records, and accounts, which, in
> reasonable detail, accurately and fairly reflect the transactions and
> dispositions of the assets of the issuer; and
>
> (2)    Devise and maintain a system of internal accounting controls
> sufficient to provide reasonable assurances that –
>
>> (a)    Transactions are executed in accordance with
>> management's general and specific authorization; and
>>
>> (b)    Transactions are recorded as necessary to
>> permit preparation of financial statements in

conformity with generally accepted accounting principles.

50.    In addition, according to Appendix D to the Statement on Auditing Standards ("SAS") No. 55, management should consider, among other things, such objectives as: (a) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (b) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

51.    According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

52.    Sonus will have to admit that it inappropriately recorded transactions included in its FY 2003 results, and will have to restate those results to remove millions in improperly reported revenues, such that its FY 2003 financial statements were not a fair presentation of Sonus' results and were presented in violation of GAAP and SEC rules.

53.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial

statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

54.    In Sonus' 2002 Form 10-K, it represented that it recognized revenue in accordance with GAAP.

55.    Pursuant to GAAP, which describes the accounting for revenues, revenue should not be recognized unless there is persuasive evidence of an agreement, collection is probable and delivery has occurred.

56.    During the Relevant Period, Sonus improperly recognized revenue even though these conditions did not exist.

57.    Ultimately, on February 11, 2004, Sonus announced that its results would be delayed. However, in actuality, the Company will need to restate its FY 2003 results to eliminate millions in revenue that had been improperly recorded and increase its past-stated expenses.

58.    The fact that Sonus will restate its financial statements for FY 2003 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sonus was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited

27

circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Sonus' restatement will not be due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatement will be an admission by Sonus that its previously issued financial results and its public statements regarding those results were false.

59.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a.     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

28

accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

      e.    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

      f.    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

      g.    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

      h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

      60.    Plaintiff brings this action derivatively in the right and for the benefit of Sonus to redress injuries suffered, and to be suffered, by Sonus as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as

well as the aiding and abetting thereof, by the Individual Defendants. Sonus is named as a nominal defendant solely in a derivative capacity.

61.     Plaintiff will adequately and fairly represent the interests of Sonus in enforcing and prosecuting its rights.

62.     Plaintiff is and was a owner of the stock of Sonus during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

63.     The current Board of Directors of Sonus consists of the following individuals: Director Defendants Ahmed, Gruber, Anderson, Notini, Ferri and Severino. Plaintiff has not made any demand on the present Board of Directors of Sonus to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

        a.      As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current members of the Sonus Board participated in the illegal insider selling:

        (i)     During the Relevant Period, Anderson engaged in massive insider trading disposing of 65,584 shares of his personally held Sonus stock for proceeds of $448,918.34. Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

        b.      The Compensation Committee of the Board determines, after consulting with

30

the CEO, establishes, authorizes and administers Sonus' compensation policies, practices and plans for Sonus' directors, executive officers and other key personnel. The Compensation Committee is comprised of defendants Ferri and Severino. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Ferri and Severino. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Ahmed, Gruber, Anderson and Notini is futile;

      c.    The principal professional occupation of defendants Ahmed and Gruber is their employment with Sonus, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Accordingly, defendants Ahmed and Gruber lack independence from defendants Ferri and Severino, who exert influence over defendants Ahmed and Gruber's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Ahmed and Gruber incapable of impartially considering a demand to commence and vigorously prosecute this action;

      d.    According to Sonus' Proxy Statements filed with the SEC, Director Defendants Anderson, Ferri and Severino served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of Sonus' internal auditors and independent accountants. The Audit Committee evaluates Sonus' organization and its internal controls, policies, procedures and practices to determine whether they are reasonably designed to: provide for the safekeeping of Sonus' assets; assure the accuracy and adequacy of Sonus' records and financial statements; reviews Sonus' financial statements and reports; monitors compliance with Sonus' internal controls, policies, procedures and practices; and receives direct compliance reports

31

from Sonus' internal auditors and General Counsel and from the independent accountants. Nonetheless, the Audit Committee recommended that the Board include the improper audited financial statements in Sonus' filings with the SEC during the Relevant Period. By such actions, these defendants breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

e.   The entire Sonus Board of Directors and senior management participated in the wrongs complained of herein. Sonus' directors are not disinterested or independent due to the following: Director Defendants Ahmed, Gruber, Anderson, Notini, Ferri and Severino served on the Sonus Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Sonus and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Sonus Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Sonus to millions of dollars in liability for possible violations of applicable securities laws;

f.   The Director Defendants of Sonus, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Sonus' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

g.   As detailed herein in particularity at ¶¶ 15-20, in order to bring this suit, all of the directors of Sonus would be forced to sue themselves and persons with whom they have

32

extensive business and personal entanglements, which they will not do, thereby excusing demand. As set forth in particularity in ¶¶ 15-20 because a majority of the Director Defendants have long-term personal, professional and financial relationships with each other and other board members, a majority of the Director Defendants could not have adequately considered a demand to bring the allegations made herein rendering any such demand futile;

        h.     The acts complained of constitute knowing violations of the fiduciary duties owed by Sonus' officers and directors and these acts are incapable of ratification;

        i.     Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

        j.     Any suit by the Director Defendants to remedy these wrongs would likely expose the Individual Defendants and Sonus to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

        k.     Sonus has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sonus any part of the damages Sonus suffered and will suffer thereby;

        l.     If the Director Defendants were to bring this derivative action against

33

themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

m.    If Sonus' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Sonus. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiffs assert, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Sonus against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Sonus, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Sonus to sue them, since they will face a large uninsured liability.

34

64.     Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for Sonus for any of the wrongdoing alleged by plaintiffs herein.

65.     Plaintiff has not made any demand on shareholders of Sonus to institute this action since such demand would be a futile and useless act for the following reasons:

a.     Sonus is a publicly held company with approximately 244.45 million shares outstanding, and tens of thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

66.     As a direct result of the Individual Defendants' breaches of their fiduciary duties and other violations of law, the Company has been severely damaged. The Individual Defendants' conduct have caused severe, irreparable, injury and damage to the Company's reputation and goodwill in the investment and business communities and threaten to virtually destroy this once valuable franchise. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Sonus' ability to raise capital - on favorable terms - will be impaired in the future. Indeed, the Company's market capitalization has already been severely damaged with over $1.2 billion erased, or 46% of the Company's market value during the Relevant Period, and severely reducing the Company's financing options and the Company has been downgraded by multiple analysts.

35

67.     In addition, significant Company money will have to be spent defending the Company in the numerous securities fraud lawsuits brought against the Company as a direct result of the conduct of the Individual Defendants. These lawsuits will costs hundreds of thousands to defend and possibly millions if not tens of millions to resolve. In addition, the Company has and will continue to waste corporate funds relating to investigations and the audit and impending restatement including already having to hire Hale and Dorr and PricewaterhouseCoopers to conduct an independent investigation.

## VI.

## CAUSES OF ACTION

### COUNT I

#### Against All Individual Defendants for Breach of Fiduciary Duty

68.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.     The Individual Defendants owed and owe Sonus fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Sonus the highest obligation of good faith, fair dealing, loyalty and due care.

70.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

71.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's

36

corporate interests.

72.    As a direct and proximate result of the Individual Defendants' failure to perform their

fiduciary obligations, Sonus has sustained significant damages. As a result of the misconduct alleged

herein, the Individual Defendants are liable to the Company.

73.    Plaintiff on behalf of Sonus has no adequate remedy at law.

## COUNT II

### Against All Individual Defendants for Abuse of Control

74.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

75.    The Individual Defendants' misconduct alleged herein constituted an abuse of their

ability to control and influence Sonus, for which they are legally responsible.

76.    As a direct and proximate result of the Individual Defendants' abuse of control, Sonus

has sustained significant damages.

77.    As a result of the misconduct alleged herein, the Individual Defendants are liable to

the Company.

78.    Plaintiff on behalf of Sonus has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants for Gross Mismanagement

79.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

80.    By their actions alleged herein, the Individual Defendants, either directly or through

aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

37

to prudently managing the assets and business of Sonus in a manner consistent with the operations of a publicly held corporation.

81.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sonus has sustained significant damages in excess of tens of millions of dollars.

82.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

83.     Plaintiff on behalf of Sonus has no adequate remedy at law.

### COUNT IV

### Against All Individual Defendants for Waste of Corporate Assets

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     As a result of the improper statements and improper financial reporting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Sonus to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions as well as wasting funds for an internal investigation, having to hire Hale and Dorr and PricewaterCoopers to conduct an independent investigation, as well waste relating to the pending restatement.

86.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of Sonus has no adequate remedy at law.

38

## COUNT V

### Against All Defendants for Unjust Enrichment

88.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Sonus.

90.    Plaintiff, as a shareholder and representative of Sonus, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VI

### Against The Insider Selling Defendants For Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Sonus common stock on the basis of such information.

93.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when he sold Sonus common stock.

94.    At the time of his stock sales, the Insider Selling Defendants' sales of Sonus comm

39

stock while in possession and control of this material adverse non-public information was a breach of

his fiduciary duties of loyalty and good faith.

95.    Since the use of the Company's proprietary information for their own gain constitutes

a breach of the Insider Selling Defendants fiduciary duties, the Company is entitled to the imposition

of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount

of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary

duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to

assure that plaintiffs on behalf of Sonus have an effective remedy;

C.    Awarding to Sonus restitution from the defendants, and each of them, and ordering

disgorgement of all profits, benefits and other compensation obtained by the defendants including all

illegal proceeds from insider selling;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

40

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 20, 2004.

Mary T. Sullivan, Esq. BBO#487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187

Brian J. Robbins, Esq.
Jeffrey P. Fink, Esq.
ROBBINS UMEDA & FINK, LLP
1010 Second Ave., Suite 2360
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

George E. Barrett, Esq.
Douglas S. Johnston, Jr., Esq.
Timothy L. Miles, Esq.
BARRETT JOHNSTON &
PARSLEY
217 Second Avenue, North
Nashville, TN 37201
Telephone: 615/244-2202
Facsimile: 615/252-3798

James G. Stranch, Esq.
BRANSTETTER KILGORE
STRANCH & JENNINGS
227 Second Avenue, North
Nashville, TN 37201
Telephone: 615/254-8801
Facsimile: 615/255-5419

Attorneys for Plaintiffs

Mts/9012/complaintfinal.doc

# VERIFICATION

I, Brian Tillman,  am a plaintiff in the within action and a resident of the State of New York.  I have read the foregoing complaint and know the contents thereof, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

February 19, 2004

Brian Tillman